1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  SARA TURNER, State Bar No. 158096
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5712
    Fax:  (415) 703-1234
8   Email:  Sara.Turner@doj.ca.gov

9  Attorneys for Respondent

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  **JOSEPH DEONN HORNE,**                    C 07-4592 SBA (PR)

14                              Petitioner,

15           **v.**

16  **ROBERT HOREL, WARDEN,**

17                              Respondent.

18

19     **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3  STATEMENT OF THE CASE                                                                   1

4  STATEMENT OF FACTS                                                                      3

5  STANDARD OF REVIEW                                                                     13

6  ARGUMENT                                                                               14

7  I.   THE CALIFORNIA STATE COURT PROPERLY REJECTED
        PETITIONER'S CLAIM OF INEFFECTIVE ASSISTANCE OF
8       COUNSEL DURING CROSS-EXAMINATION                                                  14

9       A.   State Trial Court Proceedings                                                14

10      B.   State Court Of Appeal Proceedings                                            16

11      C.   The State Court Of Appeal Properly Found That There Was No Prejudice
             Due To Counsel's Failure To Make Objections During Petitioner's Cross
12           Examination                                                                  17

13  II.  PETITIONER WAS NOT DEPRIVED OF THE EFFECTIVE
         ASSISTANCE OF COUNSEL WHEN HE TESTIFIED IN THE
14       NARRATIVE                                                                        20

15      A.   Relevant State Court Proceedings                                             20

16      B.   Petitioner Was Not Denied Effective Assistance Of Counsel When He Was
             Required To Testify In The Narrative                                         22
17
18      C.   Testimony By Petitioner In The Narrative, Rather Than In Question-and-
             answer Form, Did Not Prejudice Petitioner                                    24

19  III. THE    STATE    COURT    REASONABLY    REJECTED
         PETITIONER'S NOTICE CLAIM IN GROUND THREE AS
20       PETITIONER HAD NOTICE OF CHARGES AGAINST HIM                                     25

21      A.   The State Court Of Appeals Properly Concluded That There Was No Sixth
             Amendment Violation; Petitioner Had Actual Notice Of The Charges And
22           The Jury Was Properly Instructed                                             26

23      B.   The State Court Properly Concluded There Was No Ineffective Assistance
             Of Counsel                                                                   28
24
    CONCLUSION                                                                            29
25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Bell v. Cone*
5  535 U.S. 685 (2002) .................................................................. 17

6  *Bell v. Cone*
535 U.S. 685 (2002) .................................................................. 23
7

*Brecht v. Abrahamson*
8  507 U.S. 619 (1993) .................................................................. 27

9  *Cole v. Arkansas*
333 U.S. 196 (1948) .................................................................. 26
10

*Cooks v. Spalding*
11  660 F.2d 738 (9th Cir. 1981) .................................................... 25

12  *Fry v. Pliler*
127 S. Ct. 2321 (2007) ............................................................. 27
13

*Gautt v. Lewis*
14  489 F.3d 993 (2007) ................................................................. 26

15  *Gautt v. Lewis*
489 F.3d 993 (9th Cir. 2007) .................................................... 27
16

*Gray v. Raines*
17  662 F.2d 569 (9th Cir.1981) ..................................................... 26

18  *Hovey v. Avers*
458 F.3d 892 (9th Cir.2006) ..................................................... 23
19

*Jones v. Smith*
20  231 F.3d 1227 (9th Cir. 2001) .................................................. 28

21  *Lockyer v. Andrade*
538 U.S. 63 (2003) ................................................................... 14
22

*Lowery v. Cardwell*
23  575 F.2d 727 (9th Cir. 1978) .................................................... 22

24  *Mickens v. Taylor*
535 U.S. 162 (2002) .................................................................. 17
25

*Morrison v. Estelle*
26  981 F.2d 425 (9th Cir. 1992) .................................................... 26

27  *Murtishaw v. Woodford*
255 F.3d 926 (9th Cir. 2001) .................................................... 26
28

**TABLE OF AUTHORITIES** **(continued)**

Page

*Nix v. Whiteside*
475 U.S. 157 (1986)                                                      22, 24

*People v. Bright*
12 Cal.4th 652 (1996)                                                        25

*Sheppard v. Rees*
909 F.2d 1234 (9th Cir.1990)                                                 26

*Strickland v. Washington*
466 U.S. 668 (1984)                                          16, 17, 22, 24, 29

*United States v. Cronic*
466 U.S. 648 (1984)                                                      17, 23

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                       13, 14

*Yarborough v. Gentry*
540 U.S. 1 (2003)                                                            17


**Constitutional Provisions**


United States Constitution
        Sixth Amendment                                                      26


**Statutes**


Antiterrorism and Effective Death Penalty Act of 1996                        13

California Penal Code
        § 664                                                            26, 27
        § 664, subd. (a)                                                      25

United States Code, Title 28
        § 2254(d)                                                     14, 19, 29
        § 2254(d)(1)                                                          14


**Other Authorities**


California Jury Instructions, Criminal
        No. 8.67                                                             28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  SARA TURNER, State Bar No. 158096
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5712
     Fax:  (415) 703-1234
8    Email:  Sara.Turner@doj.ca.gov

9  Attorneys for Respondent

10           IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  **JOSEPH DEONN HORNE,**                    C 07-4592 SBA (PR)

14                              Petitioner,    **MEMORANDUM OF POINTS
                                               AND AUTHORITIES IN**
15       **v.**                                **SUPPORT OF ANSWER**

16  **ROBERT HOREL, WARDEN,**

17                              Respondent.

18

19

20                    **STATEMENT OF THE CASE**

21          On April 26, 2005, a Monterey County jury convicted petitioner of murder with a

22  "criminal street gang" special circumstance, enhancements for discharging a firearm, causing great

23  bodily injury and death, and committing the offense for the benefit of a criminal street gang;

24  attempted murder with gang and firearm discharge enhancements; assault with a firearm with a gang

25  enhancement; making criminal threats; shooting at an occupied vehicle with a gang enhancement;

26  sale or transportation of a controlled substance with a gang enhancement; shooting at an inhabited

27  dwelling with a gang enhancement; and assault with a firearm with a gang enhancement.  Ex. 1,

28  Clerk's Transcript ("CT") 336-37, 339-43.

1    On October 13, 2005, petitioner was sentenced to the term of life without parole for the

2    murder plus a consecutive indeterminate life term for using a firearm; a consecutive indeterminate

3    life term for the attempted murder plus a 20-year firearm enhancement; a consecutive life term for

4    shooting at an occupied vehicle; a consecutive life term for shooting at an occupied dwelling; a

5    consecutive determinate term of three years for selling drugs; plus a four-year gang enhancement;

6    and a consecutive eight-month term for making a criminal threat.   CT 175-78.

7    On March 20, 2007, the California Court of Appeal reversed the judgment only with

8    respect to the conviction for making criminal threat on the basis of instructional error.   Ex. 6,

9    attached App. A.[1/]  Petitioner filed a petition for review with the California Supreme Court and on

10   June 25, 2007, the California Supreme Court denied review.  Exs. 6, 7.  Petitioner filed a petition

11   for writ of habeas corpus with the California Supreme Court and on June 25, 2007, the California

12   Supreme Court denied the petition.  Exs. 8, 9.

13   On September 5, 2007, petitioner filed the instant federal petition for writ of habeas corpus

14   and on March 24, 2008, filed a "first amended" petition under 28 U.S.C. § 2254, raising the

15   following issues: 1) ineffective assistance of trial counsel during petitioner's cross examination; 2)

16   ineffective assistance of trial counsel for failing to present petitioner's direct examination in the form

17   of questions and answers; and 3) ineffective assistance of trial counsel for failure to object to the

18   verdict and sentence for attempted murder on the "ground that the enhancement of premeditation

19   was not pleaded as required."  First Amended Petition at 6 and attachment pages 11-16.[2/]

20   On March 27, 2008, this Court issued an Order to Show Cause, directing respondent to

21   answer pursuant to Rule 5 of the Rules Governing Section 2254 Cases.

22

23

24

25
_____

26   1.  The California Court of Appeal opinion is attached to the Petition for Review as
     Appendix A.

27
     2.  Respondent answers the "First Amended Petition" filed March 24, 2008, and does not
28   address the earlier September 27, 2007 petition.

MPA In Support Of Answer - *Horne v. Horel* - C 07-4592 SBA (PR)

1

### STATEMENT OF FACTS

2          The California Court of Appeal summarized the facts of the offenses[3], committed between

3    January 31 and November 11, 2002, as follows:

4          **January 31, 2002-Sale of a Controlled Substance (Count 7)**

5          In January 31, 2002, members of a police drug enforcement team in Seaside arranged
     for Beverly Jones, an addict and paid informant, to make a controlled buy of cocaine from
6    a dealer on Flores Street, where drug dealing was suspected.  After being searched and
     given money, Jones went to the area.  The team observed defendant enter Jones's vehicle.
7    A short time later, he got out. Jones drove to a predetermined location, where she met a
     member of the team and produced some rock cocaine that she had purchased from
8    defendant.

9          **The Defense**

10         Defendant testified that he had accepted rides from Jones in the past.  He could not
     recall this particular incident very well but thought it was the time he had flagged her
11   down for a ride.  On that occasion he had bought drugs from someone called "Muchee"
     before defendant got into her car.  Defendant admitted that he had sold drugs in the past
12   but denied selling to Jones that day.

13         **March 12, 2002-Shooting at an Occupied Vehicle (Count 6)**

14         On March 12, 2002, Marcus Boykin, a drug user with prior convictions for robbery
     and possession of drugs, drove another man to Flores Street to buy some crack cocaine.
15   Later, Boykin returned and was confronted by a group of men, including defendant, who
     were angry about a "drug rip off."  Four of them entered Boykin's car, and one threatened
16   him with a gun.  Boykin got out, and defendant, who had a big gun in his hand, asked
     about some drugs that Boykin's friend had not paid for.  He punched Boykin, and then
17   told him to leave.  As Boykin drove away, someone fired shots at his car.

18         A short time later, Boykin told Officer Danny Martin of the Seaside Police
     Department that defendant had shot at him.  He also told Officer Martin to get defendant
19   off the street before he killed him.  Officers Martin and Cruz Gonzalez located defendant
     at Latina Harris's home after the incident.  Defendant denied having an altercation with
20   anyone.

21         **The Defense**

22         Defendant denied shooting at Boykin's car.  He claimed that he saved Boykin from
     being shot.  He said that when the men jumped into Boykin's car, he told them to get out.
23   Despite defendant's intervention, Boykin cursed him.  Defendant then punched Boykin
     and told him to leave.  At that point, a man put a gun to Boykin's head and demanded
24   money before he left.  Defendant snatched the gun away, and Boykin drove away.
     Defendant put the gun down, and the man retrieved it and shot at Boykin's car.

25

26

27

     3.  The statement of facts filed by respondent in the state court with record citations is Ex.
28   4 at 3-47.

**July 22, 2002-Criminal Threats against the Welch Family (Count 5)**

On July 22, 2002, Gay Lavern Rhone, and her cousin Jimmy, who are members of the Welch family, were at the Nations Market. As Rhone came out of the store, she heard someone say something like "if I don't get my money, I'm going to blow or smoke the whole Welch family and starting with Lisa and the baby."[4] She did not see the person, but when she turned, she saw defendant among others, and at trial she identified defendant as person who made the statement.

Rhone and Jimmy looked for and found Lisa and Lisa's father Samuel Welch at a car lot and conveyed the threat. All of them went immediately to the police station and reported the threat to Officer Gonzalez.

Officer Gonzalez interviewed Lisa. She explained that defendant had put a down payment on a used vehicle, but later after she and defendant broke up, she returned the vehicle without getting a refund of defendant's money. Lisa thought defendant had "gone crazy." She urged his arrest, wanted a restraining order, and intended to leave town. The next day, however, Lisa asked that the charges be dropped. She told Officer Gonzalez that her family had made the threat seem more serious than it was and had pressured her to make a report.

At the station, Officer Gonzalez also interviewed Samuel Welch. Samuel said that he had recently overheard defendant threaten Lisa on the phone. He said he would kill Lisa, her baby, and the whole family if he did not get his money back on a vehicle. At the time, Samuel took the threat seriously. He too asked Officer Gonzalez to arrest defendant.

At trial, Lisa explained that she returned the vehicle that defendant had paid for without getting a refund. Later, she was looking for another vehicle, when Rhone and Jimmy showed up and told her about defendant's threat. She said her family forced her to report the threat even thought she did not take it seriously. She also denied that defendant ever threatened her over the phone. However, she admitted that she had previously testified about the telephone threat before the Grand Jury. She explained that she had been confused by and misunderstood the question.

Samuel Welch testified that he overheard defendant threaten Lisa on the phone. He said he reported the threat to Officer Gonzalez.

**The Defense**

Defendant testified that he bought Lisa a vehicle, but then she threatened to take it back. He said she was angry because he was spending more time with the vehicle than with her. At the Nations Market, he and Jimmy Welch got into a loud argument. He had called Lisa a "B" because she was trying to take his vehicle back, her father was letting her do it, and he was losing his money. Defendant said he and Jimmy called each other names and threatened to kick each other's "A." However, he did not threaten to kill anyone.

---

4.    Alicia Welch, who also goes by the name Lisa, is Rhone's first cousin. At the time, Lisa was defendant's fiancée and pregnant. On November 28, 2002, she gave birth to their daughter J'Ryna D'Syre Horne.

Defendant admitted that he and Lisa had argued over the phone about the vehicle. When she told him she had returned it, he threatened to kick her "A" if he did not get his money back. She responded that he would never see his child. They continued to argue and curse each other, and then he hung up. A few hours later, she met defendant and told him she had returned the vehicle and gone to the police.

**November 10, 2002-Shooting at an Occupied Dwelling & Assault (Counts 8 & 9)**

On the evening of November 9, 2002, Gene Alton Stewart, Samantha Smith, and Ollie Mitchell were at Beverly Jones's home in Seaside and then left. Stewart testified that around 1:00 a.m. the next morning, November 10, he, Smith, and Mitchell drove to Salinas to buy some crack cocaine.[5] Mitchell gave Stewart money, and Stewart bought the crack. Stewart then kept some it for himself and gave what remained to Mitchell. Mitchell was angry about being short-changed and said that Stewart would have to deal with defendant when they got back to Seaside.

Later that day, Stewart encountered defendant and others at the Del Monte Manor apartments. Defendant said, "You must wanna die, messing with my cousin" and tried to
punch Stewart. They fought until Stewart got the upper hand and some people broke it up. Stewart then left for his motel room. Thirty minutes later, defendant and Mitchell arrived and assaulted Stewart with a gun and beer bottle.

That night, Stewart was at Jones's house again smoking crack. At one point, he noticed defendant, Mitchell, and Samantha Smith approaching the house. Defendant appeared to have a gun. Stewart sneaked out through a side door when he heard someone ask for "Geno."

Jones testified that there was a knock on her door, and when she asked who was there, Mitchell asked for Stewart. Jones said he was not there. Defendant then said he knew that Stewart was there. Jones said nothing and then three shots came through the house. Jones heard Smith say, "[L]et's get out of here." Jones called the police, and later saw defendant, Mitchell, and Smith watching her from a nearby hill as she spoke to an officer.

Jerry Smith, the mayor of Seaside, was awakened by gunshots that night. He looked outside and saw two black men and a white woman walk from Jones's residence, get into a small Nissan four-door silver/gray car, and drive away.

**The Defense**

Defendant testified that on November 9, 2002, he came home drunk, went to bed, and stayed in bed the next day. Later, he found out that someone named "Geno" had robbed his cousin. He admitted fighting Gene Stewart, but he said the reason was that Stewart had molested his 16-year-old cousin.

---

5.    At the time of trial, Stewart was serving a four-year prison term. He had two prior robbery convictions. He agreed to testify in exchange for the prosecutor's effort to obtain a one-year reduction in his prison term.

**November 11, 2002-Murder, Attempted Murder, & Assault (Counts 1, 2 & 3)**

The murder of Jason Ewing and attempted murder of Jaymes Lambert occurred early in the evening of November 11, 2002.

Sometime between 5:00 and 6:00 p.m. that day, Joy Price, her brother Jason Ewing, Jaymes "Nutty" Lambert, Charles Earle and some others were on the street outside the Ewing house on Darwin Street, which is known as "D-Block." At one point, defendant walked by with some associates and said "Mob." He then lifted both arms as if he were signaling a touchdown. Someone in Jason's group yelled back "PJ's." A short time later, Jason, Lambert, and Earle left for the Food Corner market on Noche Bueno Street and San Pablo Avenue.

Lakeylia Ross was outside the market. She testified that defendant and others were also there. At one point, Jason and Lambert walked by, and someone said, "There goes that nigger right there." Defendant then said, "About to go get my strap," which means about to go get his gun. He then left the market. Ross heard someone in the crowd say, "It's about to go down."

Deborah Harris, defendant's cousin, testified before the Grand Jury that she and her aunt were also at the food market. At one point, three men came up to them, and Harris warned them to "get off the corner before [they] got shot." Although at trial she denied saying this, her high school math teacher, Dennis Alexander, testified that the day after the shooting, Harris told him that she had warned Jason to leave the market before he got shot.

Lakeylia Ross further testified that she left the market and walked up San Pablo Avenue. She saw Jason and Lambert talking to Carlette Wanton, Vantoinette Fraley, and a woman named Bianca. Ross heard someone warn Jason to leave the corner "because something bad was going to happen." Suddenly, a silver car drove up. Defendant got out, walked over to Jason, announced, "Seaside Mob," and then shot him in the chest, killing him. Ross later identified defendant as the shooter to Detective Barry Pasquarosa of the Seaside Police Department.

Gene Stewart, who had sneaked out of Jones's house the night before, testified that around 6:00 p.m., he went to the corner of San Pablo Avenue and Luxton Street with a gun because he intended to confront defendant. He saw defendant and Jason arguing at the next corner. He heard Jason say that defendant owed him money. Defendant replied, "Fuck that." He then pulled out a gun, which looked like a Glock, and shot Jason twice.[6/]

Vantoinette Fraley testified that while she was talking to Lambert, she heard some shots. She did not recall telling her friend Carlette Wanton anything about the shooting. Nor did she recall telling Tracy Spencer, an investigator for the District Attorney, during

---

6.     Stewart admitted that when police questioned him about the incident, he said he did not know anything. He explained that he lied because he did not want to be known as a "snitch." St. Clair, the defense investigator, testified that six months before trial, Stewart told him that he did not witness the shooting. St. Clair also testified that he went to the location from where Stewart allegedly witnessed the shooting same date and time but two years later. According to St. Clair, it was too dark to see the features of a person a block away.

1    a taped interview, that Wanton had said that a man pushed her out of the way before the
2    shooting and later identified the man was "J.D." However, Fraley said she had no reason
     to lie to Spencer and had been honest.

3        Fraley did not recall seeing a Lexus or telling Spencer that she had. She said she did
4    not know defendant before the trial and did not see him during the incident. However,
     Spencer testified that during her interview, Fraley recognized a photograph of defendant
5    and referred to him as J.D. She also told Spencer that moments before the shooting, she
     saw a silver Lexus and then heard a car door slam shut.

6        Carlette Wanton initially denied that she and Fraley witnessed the shooting. She
7    admitted that shortly after the shooting, she told an officer that she and Fraley had been
     there. However, she said that was a lie. She denied getting gun powder burns, telling
8    Spencer about the burns, or telling an officer she had seen fire from the gun. However,
     after hearing a tape of her interview, she acknowledged her presence at the scene and
9    answered questions about who had been there and what she had seen. She testified that
     at one point, Jason came over to her, and then suddenly a dark-skinned man in dark
10   clothing, a beanie hat, and hooded sweatshirt shot Jason. She saw fire and heard two
     shots. She did not know the shooter and said defendant was not there.

11       Wanton denied that defendant had pushed her out of the way or ever saying that he
12   had done so. She acknowledged that that was what Fraley had told Spencer, and she
     admitted telling Spencer that "[i]f that's what [Fraley] says happened, I guess that's what
13   she saw." However, she explained that she was not admitting that defendant pushed her
     but only that is what Fraley thought had happened.

14       Jaymes Lambert testified that on November 11, 2002, he and Jason were talking to
15   some girls when he heard two loud "booms" behind him. He did not see the shooter. He
     ran and more shots were fired at him. Brandon Rubin and Andrew Gil, who were on the
16   street at the time, saw a black man in a blue sports jersey chasing after and shooting at
     another black man.

17       Lambert testified that he knew defendant only by sight and did not see him that
18   evening. However, Lambert identified himself in a photograph the included himself,
     defendant, Lisa, and Jason's brother Jared Ewing in a friendly pose.

19       Lambert opined that there are no longer gangs in Seaside known as PJC or the Mob.
20   He said they had stopped being active years ago, and now everyone got along. However,
     he admitted that he told Detective William Clark of the Monterey Police Department that
21   he had been in PJC since he was 14 or 15, but he said that was a lie. Lambert admitted that
     after the shooting, he got a bone tattoo of the letters "H" and "T" on his arms. He claimed
22   it stood for "Hard Times" and not Hilltop.

23       Scot Armstrong, a senior criminalist and ballistics expert with the California
     Department of Justice, analyzed shell casings recovered from both Beverly Jones's house
24   and the murder scene. All were the same caliber and had been fired from the same gun,
     which, he opined was a Glock.

25       Defendant's fiancée Lisa Welch, Elizabeth Gadson, and her daughters Pasia and
26   Alaina testified that on November 11, 2002, Lisa took Pasia and Alaina shopping for baby
     things and then returned to Lisa's apartment. Pasia and Lisa testified that some other
27   people were there.

28       Lisa testified that after they returned, defendant went outside to get some marijuana
     from his friends. Later, he assembled a baby stroller and bassinet in their bedroom. Lisa

said that defendant did not leave the apartment, except to have a smoke out on the balcony. She said that around 6:45 p.m., Elizabeth Gadson arrived to get Alaina and Pasia. Gadson testified that she did not see anyone outside when she arrived. Lisa said that after Gadson left, she drove some friends home, shopped, and came home to find defendant watching a movie.

Detective Joseph Bertaina of the Seaside Police Department, who interviewed Lisa, testified that she told him that defendant was in and out of the apartment during an impromptu baby shower. At sunset, he came in and never left. However, Lisa later corrected herself when Detective Bertaina told her that Pasia had said that defendant was never in the apartment. Lisa then said that defendant was not actually in the apartment but rather outside smoking and talking to his friends. She knew he never left because she checked on him every 15 minutes.

At trial, Lisa acknowledged some of what she had said to Detective Bertaina. However, she denied hearing what Pasia had said or saying that defendant had been outside the apartment. She did not recall saying that she had checked on him every 15 minutes.

Pasia and Alaina testified that defendant was in and out of the apartment while they were there. However, Gary St. Clair, a defense investigator, testified that Pasia told him that she saw defendant only before she went shopping with Lisa and not when they returned later in the afternoon. He testified that Alaina told him she did not see defendant before her mother came to get her and Pasia. She also told St. Clair that there was no baby shower that day. At trial, Alaina said she may have said those things to St. Clair and admitted that her memory was better during that interview. Nevertheless, she was certain that she saw defendant at some point that day.

Detective Bertaina also interviewed Pasia. He asked her whether defendant had been at the apartment between 4:30 and 6:45 p.m. She said no. At trial, Pasia admitted saying that. However, she also testified that she saw defendant sometime somewhere that day.

Samuel Welch testified that he saw Pasia, Alaina, and defendant at the apartment. However, Detective Pasquarosa interviewed Samuel, who at that time said he saw Pasia, Alaina, and Lisa but not defendant during the day. Welch further said that defendant might have returned later that night, but he did not see him.

Trish Monta testified that on November 13, 2002, two days after the shooting, she drove Lisa and defendant to a hospital in San Jose to visit Monta's daughter Amber. She said that Lisa got a call at the hospital and learned that defendant had been accused of killing Jason. Lisa became upset and said the accusation was not true. Monta advised Lisa and defendant to go to the police. Monta further testified that at home later that evening, she saw defendant's picture on TV and called Lisa. Lisa became hysterical. Monta again advised her to go to the police.

Lisa testified that after they returned from visiting Amber, she and defendant drove back to San Jose and stayed overnight in a motel. She explained that she previously had talked to Amber about visiting her the next day, and she and defendant also and had plans to visit his mother in Barstow.[7] Lisa denied getting a call at the hospital about defendant. She also denied discussing the call with Monta either at the hospital or later that evening

---

7.     Monta testified that when they were all at the hospital, Lisa did not talk to her about returning the next day to visit Amber again.

MPA In Support Of Answer - *Horne v. Horel* - C 07-4592 SBA (PR)

over the phone.  Lisa testified that she did not learn that defendant was a suspect until November 14, 2002, when defendant was arrested.

On November 14, 2002, around 8:00 a.m., Officer David Lee of the San Jose Police Department drove by the California Motel in San Jose.  He saw a man and a woman near a car that was sought in connection with Jason's murder.  He broadcast a description of a man. When Officer Bill Wolf of the San Jose Police Department spotted a man who fit the description, the man ran.  Police pursued and arrested the man, who was defendant.

Jeff Hass, an evidence technician for the Seaside Police Department, searched Lisa's Nissan Sentra.  Among other things, he found photographs of defendant and Lisa, one of which showed defendant sitting on a couch throwing a gang sign; a blue "Cowboys" sports jersey with the number "eight" and the name "Aikman" on it; and two cameras containing film.  Pictures from one camera are dated November 4, 2002, and from the other November 11, 2002.  One picture shows money and what appears to be a Glock on Lisa's stomach. Pictures dated November 11, 2002, show defendant and a baby bassinet. Hass also found an invitation to a baby shower on October 11, 2002.

Detective Bertaina testified that during his interview with Lisa he showed her the photograph of the gun and money.  He testified that she was stunned and stuttered.  She said that a man had come to the apartment to sell it.  At trial, Lisa testified that a man and a woman, whom she did not know, came by one night to sell defendant some marijuana. At one point, the man put a gun in her lap, said he was selling it, and then grabbed her camera and took the picture of it.

Detective Bertaina also interviewed defendant.  During the interview defendant said he "hung out" at and was "a main factor" in the area of San Pablo Avenue at the Food Corner market, which he called "the block."  He said he was friendly with Jared Ewing but not Jared's brother Jason.  He reported that Jared had recently shot at Stefan "Poppa" Guest.  Defendant said he had heard "on the street" that Poppa and Raishat "Geno" McGill were suspects in Jason's murder.  He told Detective Bertaina that Gene Stewart was a "base head," who had robbed Ollie Mitchell.

Defendant told Detective Bertaina that on November 11, 2002, he spent the entire time from 5:00 to 8:00 p.m. at Lisa's baby shower along with his Aunt Marilyn Hall, Patience Davis, Peggy and Kathy Hunter, and Pasia Gadson.

On November 15, 2000, before defendant made his first court appearance, he called his cousin "Angel" and Gary "Sweet" Dunn from the Monterey County Jail.  During the call, defendant said he was "The famous MF on the block" and advised, "Hey, you need to talk to Vantoinette, man," "and Carlette," and "be up on them," which, Detective Bertaina understood to mean "be close to them, get up on them, next to 'em."

**The Defense**

Defendant testified that on November 11, 2002, he was at the Food Corner market early in the afternoon, and then he and some associates walked passed a group of people outside the Ewing house.  He said that as he passed, he said, "what up, this is mob" to reassure them and prevent a shooting.

Later, around 2:45 p.m., he went to Lisa and her father's apartment.  Lisa had just left to go shopping. He stayed there the rest of the day. Between 5:00 and 5:30 p.m., he assembled a stroller.  Around 5:45 p.m., a friend came over with some marijuana for him. Around 6:00 p.m., he and Shantay Huntley went out on the balcony and had a smoke. Later, he and Alaina Gadson assembled a bassinet.  Shortly after 6:30 p.m., Pasia and

Alaina left with their mother, and Lisa left with Shantay and Christina Edwards.

Defendant further testified that on the morning of his arrest, Lisa made a call from their motel to find out what hospital Amber was in, and defendant went outside to call his mother from a pay phone. His mother told him that he was suspected of murder. Just then, a police car drove by. Defendant told Lisa to leave for the hospital, and he left to go to the store. He later ran and was eventually caught and arrested.

Concerning the photograph of the gun on Lisa's stomach, defendant said that one night, a man named Mark was supposed to sell him some marijuana, but he could not deliver and sent someone else. The man came over with his wife and sold them a "sack." Defendant went into another room with Lisa's father, and Lisa handled the transaction by herself. After the couple left, Lisa told defendant that the man had tried to sell her a gun, and she had taken a picture of it.

Defendant testified that he had had a brief affair with Lakeylia Ross, and thereafter, she kept "hounding" him to be with her, saying she could love him better than Lisa could. However, he "ditched her."

Defendant denied that he called Angel and Sweet from jail to have them influence Carlette Wanton and Vantoinette Fraley. He said he simply wanted his friends to find out what they had said. At the time, he had already heard that Stefan "Poppa" Guest was the perpetrator.

Defendant said there were no problems between him and Jason. However, he admitted that after the shooting, he was very angry that Jason had called Lisa in the past and that in the past, they had had sex. Defendant admitted that he told his sister to assault Lisa and had angrily threatened to assault her himself. He further admitted that when Lisa said she loved him, he repeatedly told herd that he was "a boss," and everyone knew it. At trial, he explained that he was angry about a rumor that Jason had been sleeping with Lisa. He denied that he was angry because Jason was not a Mob member

Shantay Huntley testified that she is a very close friend of both defendant and Lisa. She said that she attended two baby showers for Lisa. The second one was at Lisa and her father's apartment. She arrived between 2:00 and 3:00 p.m. Some associates of defendant were there, but she did not know their names. Defendant was in the bedroom assembling a stroller and a bassinet. Around 6:00 p.m., she and defendant went outside to have a smoke.

**Gang Testimony**

Detective William Clark of the Monterey Police Department testified that in Seaside, gang members are mostly "Crips." Their rival, the Bloods, have only a small presence. He explained that there are different Crip "factions or sets," some of which identify with Seaside locales, such as "D-Block," which is the area around Darwin Street; "the Projects," which is near the Del Monte Manor Apartments housing project; and "Hilltop," which is just below apartments, in the area around Lucerne and the Nations Market. Hilltop is a set of Project Crip-i.e., "Hilltop Project Crip[s]" or "Hilltop PJC." In 2002, the two main Crip factions were "Project Crip" and the "Mob" or "Seaside Mob."

Detective Clark opined that Project Crip and the Mob both qualified as criminal street gangs as defined by statute. He explained that they both claim the color blue and use hand signs to greet fellow members or intimidate and threaten rivals. The Mob uses hand signs for "M" and "C"; Project Crip uses signs for "P" and "C." He identified a photograph of defendant making Mob hand signs. In another photograph, he identified

1    Jared Ewing and Lambert making Project Crip signs.

2        Detective Clark testified that a truce between the Mob and Hilltop PJC collapsed in
3    August 2002 because of a shooting between Jared Ewing, who was PJC, and Stefan
     "Poppa" Guest, who was Mob.  Thereafter, hostilities between the two gangs increased.
     He opined that the shooting of Jason benefitted the Mob.
4
5        Detective Clark interviewed Lambert and listened to several of Lambert's
     tape-recorded telephone calls.  He opined that Lambert was Hilltop PJC, and his "H. T."
6    tattoo signified Hilltop PJC.  Although Lambert asserted that defendant had shot Jason for
     personal, not gang-related, reasons, Detective Clark noted that in the recorded calls,
7    Lambert made a reference to the Mob, and before the murder, Lambert had warned Jason.

8        Sergeant Michael Kimball of the Seaside Police Department testified that Mob stood
     for both "murder on Broadway" and "money over bitches."  He explained that in the
9    mid-1980's, Crips from Los Angeles came to Seaside to expand their criminal activities.
     They formed the "Project Crips" or "PJC" at the Del Monte Manor.  Over time, infighting
10   developed between the young Seaside members, who wanted independence, and the older
     members.  The former members split off as the Mob; the latter became "FAM," or
11   "original family gangsters."  The two factions fought; but in 1998, they reached a truce
     concerning drug trafficking.  In 2000, the truce fell apart, violence erupted between the
12   factions, and both FAM and the Mob started recruiting new members.  At that time,
     Project Hilltop or Hilltop and D-Block developed as subsets of FAM. Hilltop or Hilltop
13   PJC was still an active gang in 2002 and friendly with D-Block, where Jason lived.

14       Sergeant Kimball concurred with Detective Clark that the Mob was a criminal street
     gang, whose primary activities included murder, robbery, burglary, assaults, car jacking,
15   prostitution, witness intimidation, firearm brandishing, drugs trafficking, and gambling.
     He testified that defendant was an active member of the Mob gang.  He based his
16   testimony on contacts with defendant; defendant's statements to police officers, including
     that he was "the most famous MF out there on the block" and a "main factor"; defendant's
17   writings and calligraphy, which include "My book, J.D., the Life of ah Boss," and "Names
     of People I know in Seaside," which appeared to be a roster of people and their individual
18   status or relationship; defendant's blue clothing and gang-related tattoos; photographs of
     defendant making gang signs; and information from other officers, police reports, and
19   CYA records.  He said that defendant had also been a member of the "Village Park Crips"
     in Barstow.[8/]

20       Sergeant Kimball testified that defendant committed each of his crimes for the
     benefit of the Mob.  He explained that the crimes helped perpetuate his reputation as a
21   boss of his turf in Seaside, generate self-esteem among gang members, provide money to
     support the Mob's activities, and let members of the community and rival gangs know
22

23   ──────────────────────────────────────────────────────

24       8.    Sergeant Kimball listed several factors on which police determine
               gang membership: whether a person has admitted gang membership,
25             has gang tattoos, wears gang clothing and colors, uses gang hand
               signs, has been seen with known gang members or participated with
26             them in criminal activity, has been photographed with gang members,
               possesses gang related writings or drawings, appears on gang rosters,
27             and frequents gang locations.  Police also rely on documentary
               information that indicates gang membership.
28

MPA In Support Of Answer - *Horne v. Horel* - C 07-4592 SBA (PR)

1    "this is what's going to happen to you" if you do not cooperate, if you testify against us,
2    and if you "mess" with us. He also asserted that the crimes also help recruit new members
     and teach the younger Mob associates how things are done.

3        Sergeant Kimball opined that when defendant called Angel and Sweet from jail and
4    said to "be up on" Vantoinette and Carlette, he meant "to have a watchful eye on them"
     and make sure they did and said what they were supposed to.

5        The parties stipulated that Tommy Clewis and Troy Caldwell had pleaded guilty to
6    a robbery on March 9, 2000, on Darwin Street. At the time, Caldwell was wearing blue
     clothing, a cap with PJC Hilltop on it, and claimed he was "PJ Crip." The parties also
7    stipulated that Daniel Kidd, Jacoby Morales, and Leonard Hobson had robbed a Seaside
     merchant at gunpoint. Detective Clark testified that he has seen gang videos in which
8    Kidd claimed Mob membership. He had also seen photographs of Kidd making Mob hand
     signs of an "M." He further had heard reports from other officers concerning Kidd's
9    association with other Mob members. Detective Clark opined that both robberies were
     committed for the benefit of Seaside Crips.

10       The parties also stipulated that on March 26, 2002, five men from Seaside-Trunell
11   Butler, Chato Geronimo, Robert Daniels, Yohance Jones, and Paul Roy-robbed a bank in
     San Jose and were later convicted of that crime. Daniels had a Seaside PJC tattoo on his
12   arm. Sergeant Kimball opined that the crime was committed to benefit the "Seaside Mob"
     because at least four of the perpetrators were from Seaside and "were part of the
13   origination or the transformation between Project Crips and Mob [that] took place. They
     are all part of that." He also noted that they had gotten their vehicle from Sherray Pope,
14   who was "part of Project Crips, who [had] then split off and created his own gang called
     Bay Ocean Pimps," which maintained friendly ties to Project Crips.

15       The parties stipulated that Antonio Parker, Tobias Jones, and Michael Gruber
16   possessed crack for sale and sold it on August 4, 1999, in the area near the Food Corner
     Market in Seaside and were convicted of that offense. Sergeant Kimball opined that the
17   offense was committed for the benefit of Seaside Mob or Seaside Crips because Parker
     and Jones were known Seaside Crips, Jones associated with the Mob, they had a blue
18   jacket in their car, they had been observed in Mob territory selling drugs, and they were
     caught doing so.

19       The parties also stipulated that Michael Dean Johnson had been convicted of
20   transporting crack for sale. Sergeant Kimball opined that Johnson had committed the
     offense for the benefit of Seaside Mob or Seaside Crips because Johnson "was part of
21   Project Crips, part of the transformation when the Crips went from Project Crips to
     C-Town and the C-Side and Seaside Mob and ... FAM." Moreover, Johnson was still
22   considered friendly with the Mob or claimed the Mob, even though he and defendant had
     sometimes fought each other. Sergeant Kimball also acknowledged that Johnson was
23   associated with Bay Ocean Pimps, which claimed to be a set of the Bloods, the Crips'
     traditional enemy.

24   **Defendant's Testimony about Gangs and his Background**

25       Defendant testified that he joined the Seaside Mob in 1994 and was an active
26   member along with Frank James, and Sheron "C-Ron" Tinsley. He denied that the Mob
     meant "murder on Broadway." Although he agreed that the Mob was a criminal street
27   gang, and gangs commit crimes, he could not say what crimes Mob members had
     committed, except for selling drugs, and even then, he could only speak for himself,
28   admitting that he had sold crack cocaine. Before the joining the Mob, he had been a
     member of the "Westside Village Park" gang in Barstow.

Concerning the history of the Mob, defendant explained that initially there was only the "Projects" gang, and everyone in Seaside was a Crip. However, the Projects splintered after a drug dealer was killed. Two Crip gangs emerged: "C-Town Mob," which later became "Seaside Mob" and the "Seaside Family" or FAM. The two gangs started "going at it," and by the end of 1994 and 1995, "you had murders, shootings everywhere," including the murder of his friend Michael Butler, who was only 15.

During that period, defendant was committed to the juvenile hall and then California Youth Authority (CYA), where he took victim awareness classes.[9]   At CYA a woman named Charlotte helped broker a peace treaty between older Project Crip members and the Mob. Jared Ewing was at CYA with him, and they became friends.

In 2001, after his release from CYA, defendant went to Seaside, where he was friendly with Mob members and others, including Jared, who was from D-Block.  His wide associations explained the pictures of him and Jared, in which they are together "throwing up" an "M" for Seaside Mob and "C" for Project Crip.

Defendant explained that Mob members traditionally habituate San Pablo Avenue and an area on Fremont called "plaza."  However, there are no exclusive Mob areas, although there are places where FAM people do not want to go because of the potential for violence.  The Project's territory was around the Del Monte Manor projects, and Hilltop "kicked it" at Nations Market.  Defendant personally spent time at Nations Market, D-Block, and Noche Buena Street, where many different people sell drugs.

Defendant testified that his tattoo -"It's Nothing to a Boss"- is a line from a rap song and had no gang meaning.  He said the phrase is inspirational and helped him keep in touch with his inner boss to overcome hardship.  His tattoo of a disheveled "bum" throwing an "M" sign represented the hard circumstances he lived in, and the "M" represented "the gang that's within my life, too."

Defendant testified that when he referred to himself as a "main factor" on the block to Detective Bertaina, he only meant that many people know him; he did not mean that he was a gang leader or boss.  He said there are many main factors on the block.

Ex. 6, Appendix A at 3-20.

## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  Under AEDPA, the federal court has no authority to grant habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application of,"

---

9.    On cross-examination, defendant admitted that before he went to CYA, he had robbed an 11-year-old by saying he had a gun.  He was committed to CYA after being arrested and found in possession of a sawed-off rifle, ammunition, a ski mask, and rubber gloves.

1   clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  A decision constitutes an

2   unreasonable application of Supreme Court law only if the state court's application of law to the

3   facts is not merely erroneous, but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75

4   (2003).  The petitioner bears the burden of showing that the state court's decision was unreasonable.

5   *Visciotti*, 537 U.S. at 25.

6                                      **ARGUMENT**

7                                          **I.**

8       **THE  CALIFORNIA  STATE  COURT  PROPERLY  REJECTED
        PETITIONER'S  CLAIM  OF  INEFFECTIVE  ASSISTANCE  OF**

9       **COUNSEL DURING CROSS-EXAMINATION**

10          In ground one, petitioner claims that he was denied effective assistance of counsel when

11  his trial counsel did not "represent him" or make objections when petitioner was cross-examined by

12  the district attorney.   First Am. Petition at 6 and attachment p. 11.  Ground one should be rejected

13  because the California court did not unreasonably apply controlling federal law in denying the claim

14  as petitioner failed to show that he was prejudiced by his counsel's performance.  Accordingly, the

15  California Court of Appeal's rejection of the claim did not contradict or unreasonably apply

16  Supreme Court precedent and was proper under § 2254(d).

17  **A.    State Trial Court Proceedings**

18          At the end of the defense case, petitioner's trial counsel indicated that petitioner would

19  testify against the advice of his attorney.[10]

20          THE COURT: We're back on the record in the case of People versus Horne, out
            of the presence of the jury.  Both counsel are present, investigating officers are
21          present and [petitioner] is present.  [Defense counsel]?

22          [Defense counsel]: Yes, Your Honor.  [Petitioner] has determined that he wants
            to take the stand and testify.
23
            The Court: That would be against your advice?
24

25      10.  In a declaration submitted with the petition for writ of habeas corpus filed in the
    California Supreme Court, counsel clarified the reason for his advice: "I did not present
26  [petitioner's] direct examination because I believed ethical reasons prevented me from doing so.
    The ethical reasons were my disbelief of [petitioner's] alibi and other statements." Ex. 6, attached
27  Ex. 2, paragraph 3.  The declaration reflects that counsel believed petitioner was going to commit
28  perjury

1       [Defense counsel]: It would be strongly against my advice.

2           . . . . . . . . . . . .

3       THE COURT: I suppose the first observation the Court would make is that at
        least it was a surprise to the Court the defendant's choice to testify. It was
        sudden and unexpected. I think that's a feeling shared by all. Is that correct?

4

5       [Defense counsel]: That's correct. Except, Your Honor, we had discussed this
        possibility several times and both my investigator and I were convinced, based
        on conversations we had with the defendant before the trial started that he had
6       finally determined that he was not going to do that.

7       THE COURT: All right. And now the choice remains that he is wishing
        testify, and that would be against your wishes?

8

9       [Defense counsel]: That correct. Against my wishes and advice.

10   RT 3261-65.

11      The court continued the discussion outside of the presence of the prosecutor:

12      THE COURT: The defense has advised or actually [defense counsel] has
        advised the defendant if he intends to testify that it is against as already stated,
13      [defense counsel's] advise. He thinks it's a bad choice. And furthermore,
        [defense counsel] has indicated to the Court and I believe to the defendant, as
14      I have earlier, that [defense counsel] will not participate in your effort to testify.

15          I say that because it's an awkward position to be in sitting up here
        testifying and your attorney is sitting not asking questions. That's an unusual
16      way for a jury to view testimony. It also means, and I know this choice was
        sudden. I believe announced, demanded if I'm not mistaken, for the first time
17      today. That until now, there was not a plan to have you take the stand. And
        that means that - - I'm just guessing now and I think [defense counsel] alluded
18      to it somewhat, that you're not organized. You're doing this on your own.
        Your presentation is going to be your best shot at testifying about what you
19      think is important, and then you will be cross-examined by a prosecutor who
        has prepared this case, as you can tell, very well. She is going to be prepared
20      to, in an organized way, cross-examine you. [¶] I may interrupt your testimony
        as you're testifying if you start treading in waters that are inappropriate, if you
21      start talking about matters that are just not appropriate. You will be given,
        otherwise, virtually free reign to testify except into areas that the Court feels
22      just are inappropriate. I can't think of anything right off the top of my head, but
        there may be some areas that you start talking about that are not proper. [¶]
23      And I would remind you that you are just like every other witness, and that is
        that you are required to tell the truth under penalty of perjury. Do you
24      understand that?

25      [Petitioner]: Yeah.

26      THE COURT: I mentioned [defense counsel] will not be asking you questions.
        Another consequence of this is that [defense counsel] -- you understand he's
27      going to make an argument in your case. He's going to argue your case to the
        jury. He's going to marshal the facts, the evidence. He's going to argue to
28      them what they should find to be the facts, and he's going to argue for you for

MPA In Support Of Answer - *Horne v. Horel* - C 07-4592 SBA (PR)

15

1

2

that jury not to find you guilty on the charges that you face. [¶]  What's going to be noticeably missing I suspect from his argument is any reference to what you testify to.  By the same token, he cannot ask you questions, I suspect for ethical reasons, [defense counsel].

3

4

[Defense counsel]: That's correct.

5

6

7

8

9

THE COURT: For ethical reasons, he cannot argue the truth of what you testify to.  He can argue the facts from other evidence, but he won't sit there and say, according to my client, he did this, that and the other thing or didn't do this, that or the other thing.  That will be noticeably absent also from his argument, as noticeable as him not asking you questions when you testify.  [¶]  In my estimation in front of a jury who's listing and watching the proceedings, it's going to be noticeable for them.  And they are likely to think it's odd.  We may be able to address that with an instruction, but we are not going to be able to address that impact.  It may be the wrong thing to do to instruct them.  I don't know.  That's a choice your attorney will have to make.

10

11

RT 3273-74.

12

13

14

15

16

17

When petitioner was called to the stand to testify, he told the jury, "First, I want to let you know that I'm here to testify and I'm very nervous. . . . I'm by myself.  So if you just give me the opportunity, I'm not a professional.  All I can do is tell you what I want you to know.  That's the truth.  RT 3283-84.  Petitioner testified in the narrative and was cross-examined by the prosecutor.  No objections were raised by counsel during the cross-examination. [11]  Petitioner did not make a motion for a new trial or request a trial court hearing on an ineffectiveness claim.

18

**B.    State Court Of Appeal Proceedings**

19

20

21

22

23

24

Petitioner argued to California State Court of Appeal that his trial counsel was  ineffective for failing to raise any objections during petitioner's cross-examination.  Ex. 3 at 28-51.  Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the Court of Appeal held that "to establish prejudice from counsel's omission, [petitioner] must demonstrate a reasonable probability that the some or all of the objections would have been sustained and that he would have obtained a more favorable result had the objections been made and sustained."  Ex. 6, Appendix A at 31.

25

26

The Court of Appeal then examined the prosecutor's cross-examination questions,

27

28

11.  In Argument II, petitioner raises the separate claim of ineffective assistance of counsel because he was "required" to testify in the narrative.

petitioner's answers, and any potential objections that might have been made (Ex. 6, Appendix A at 31-43), and stated:

> [W]e conclude that defendant has failed to demonstrate a reasonable probability that the jury would have returned a more favorable verdict on any charge or allegation had defense counsel objected to the prosecutor's questions whenever it was theoretically possible to do so, or had counsel raised a more general claim of prosecutorial misconduct. Simply put, as to those objections, both individually and collectively, counsel's omissions do not undermine our confidence in the jury's verdict. (*Strickland v. Washington, supra*, 466 U.S. at pp. 688, 694.)

Ex. 6, Appendix A at 43.

## C.   The State Court Of Appeal Properly Found That There Was No Prejudice Due To Counsel's Failure To Make Objections During Petitioner's Cross Examination

The Constitutional standard for ineffective assistance of counsel contains two prongs: (1) whether counsel's performance fell below an objective standard of reasonableness, under prevailing norms of practice, and (2) whether the defendant was prejudiced, in the sense that he would have received a more favorable result but for counsel's unprofessional errors. *Strickland*, 466 U.S. 668. If a reviewing court finds no prejudice occurred, it may rest its decision on that ground without assessing the reasonableness of counsel's performance. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") On habeas review, a third prong is added: (3) whether the state court's application of *Strickland* was not just incorrect but was "objectively unreasonable." *Terry Williams v. Taylor*, 529 U.S. at 406-07, 409-10. Claims of ineffective assistance of counsel that have been denied by the state courts must be viewed through this "doubly deferential" lens of federal collateral review. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

Petitioner cites to the case of *United States v. Cronic*, 466 U.S. 648 (1984). First Am. Pet. at 17. In *Cronic*, decided the same day as *Strickland*, The Supreme Court recognized a limited exception to the prejudice requirement when (1) assistance of counsel has been denied completely, (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," or (3) counsel is denied during a critical stage of the proceedings. *Cronic*, 466 U.S. at 658-59; *see Mickens v. Taylor*, 535 U.S. 162, 166 (2002). However, *Cronic* is not the controlling law here. The Supreme

Court clarified that when it "spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, [it] indicated that the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 696–97 (2002). In other words, the petitioner must assert counsel failed to oppose the prosecution throughout the proceeding as a whole, rather than at specific points. *Id.* "For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." *Id.* Petitioner's claim of ineffective assistance during Petitioner's cross-examination does not meet the *Cronic* standard as petitioner was represented by counsel throughout the trial. Counsel made an opening statement, made numerous motions, and raised numerous objections. Counsel cross-examined all of the prosecution witnesses, called his own witnesses, worked with an investigator, advised petitioner not to testify, and made a closing argument telling the jury it should acquit petitioner. RT 3841-98. Under the circumstances presented here, counsel's lack of objections during cross-examination of the petitioner by the prosecutor was not such that it falls within the narrow exception to warrant a presumption of prejudice.

First, respondent would argue that counsel was unable to participate in the cross-examination, for the same reason he was unable to participate in the direct examination; that is, because he was ethically precluded from doing so. See *Nix v. Whiteside,* 475 U.S. 157 (1986), "Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law." *Id.* at 166. However, even assuming, as the State Court of Appeals ultimately did, that counsel rendered deficient performance by concluding that he was precluded from making any objections to the cross-examination questions,[12] petitioner's ineffectiveness claim

---

12.    Given our discussion, we find that defendant has shown by a preponderance of the evidence that counsel's conduct during cross-examination fell below an objective standard of reasonableness: He declined to participate during cross-examination because he erroneously believed that his ethical obligation prevented him from raising objections to the prosecutor's questions. Thus, we turn to the issue of prejudice.

1   fails because he has never established prejudice under *Strickland*.  Prejudice exists where "there is

2   a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

3   would have been different.  A reasonable probability is a probability sufficient to undermine

4   confidence in the outcome." *Id.* 466 U.S. at 694.

5         Here, petitioner testified as the last witness in the defense case, and he was aware of all

6   the facts, issues, testimony, and evidence that had been presented to the jury.  It was very clear that

7   there were obvious discrepancies between petitioner's testimony and the testimony of other

8   witnesses and the jury would have certainly been aware of these discrepancies before the

9   cross-examination.  Although petitioner testified he did not know Beverly Jones, he stated that he

10  previously sold drugs and might have accepted a ride from Jones.  RT 3304, 3309, 3311.  Jones had

11  testified that on January 31, 2002, acting as a police informant in the course of a sting operation, she

12  bought cocaine from petitioner when he entered her car which was witnessed by Officer Long.  RT

13  962-79; RT 1079-86.

14        Although petitioner testified he did not shoot at Marcus Boykin on March 31, 2002, he

15  admitted he was involved in an altercation with Boykin over a drug deal involving petitioner's

16  "young crew," and that there was a gun involved.  RT 3311-33.  As to the November 10, 2002

17  shooting at Jones's house, although petitioner testified that he was at home sleeping when it

18  occurred and knew nothing about it, Jones testified that she heard petitioner asking for Gene Stewart

19  when shots were fired into her home.  RT 1064, 1196, 1694.  Jones also testified that the next day

20  she was visited by petitioner's aunt, who explained to Jones why petitioner had come to house.  RT

21  1116-18.

22        As for the November 11, 2002 murder and attempted murder, petitioner was identified by

23  eyewitnesses Carlette Wanton, Lakeylia Ross, and Gene Stewart as the person who murdered Jason

24  Ewing and shot at Jaymes Lambert.  RT 701, 776.  Although petitioner testified that he was at his

25  girlfriend's home with friends and family when the shootings took place, no one else who was the

26  home testified that petitioner was there the entire time.

27

28  Ex. 6, Appendix A at 31.

MPA In Support Of Answer - *Horne v. Horel* - C 07-4592 SBA (PR)

1       Petitioner acknowledged that after the shooting, he went to San Jose, checked into a motel,

2   took off running, when he was observed by the police, and led officers on a foot chase through two

3   auto body shops, over fences and onto the railroad tracks.  RT 3399.  His actions demonstrated a

4   consciousness of guilt inconsistent with his denials.   Thus, before any cross-examination by the

5   prosecutor, the evidence against petitioner was substantial.

6       The California Court of Appeal's rejection of petitioner's claim of ineffective assistance

7   of counsel did not contradict or unreasonably apply Supreme Court precedent and was proper under

8   § 2254(d).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.

## PETITIONER WAS NOT DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE TESTIFIED IN THE NARRATIVE

In ground two, petitioner claims that trial counsel rendered ineffective assistance of counsel when he "refused to present petitioner's direct examination by normal question and answer method; instead defense counsel did not participate in direct examination." First Am. Pet., Attachment at 13. However, the record reveals petitioner's counsel's belief that petitioner was going to commit perjury. The trial court permitted defense counsel to refuse to participate in petitioner's trial examination thus requiring him to testify in the narrative. There is no United States Supreme Court authority that provides that an attorney who believes her client is going to commit perjury renders ineffective assistance by refusing to participate in the client's direct examination. Rather, the Supreme Court has held that an attorney does *not* render ineffective assistance by refusing to participate in the presentation of perjured testimony. Furthermore, even if counsel's performance was somehow deficient, Petitioner has failed to show that he was prejudiced. Accordingly, the California Supreme Court's rejection of the claim did not contradict or unreasonably apply Supreme Court precedent.

### A.   Relevant State Court Proceedings

The relevant trial court proceedings prior to petitioner testifying in the narrative are fully set forth in Argument I, part A and incorporated herein by reference.

Petitioner first raised the claim of ineffective assistance of counsel during his direct examination by way of a Petition for Writ of Habeas Corpus filed in the California Supreme Court and the Court summarily denied the petition. Exs. 7, 8. However, when addressing petitioner's State Court appeal, the Court of Appeal discussed the propriety of the narrative testimony in this case as follows:

> In *People v. Guzman* (1988) 45 Cal.3d 915 (*Guzman*), overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13, the California Supreme Court implicitly approved letting a defendant testify with a free narrative when he or she takes the stand against the advice of counsel. There, the defendant claimed the procedure denied him effective assistance of counsel and forced him to waive his right to counsel and represent himself. (*Guzman, supra*, 45 Cal.4th at pp. 942, 946.) The Supreme Court disagreed.

The court explained that a defendant has no constitutional right to give false testimony, and defense counsel has an ethical obligation as an officer of the court to refuse to suborn perjury. (*Guzman, supra*, 45 Cal.3d at p. 943, citing *Nix v. Whiteside* (1986) 475 U.S. 157.)  Next, the court observed that the United States Supreme Court had not established what defense counsel should do when he or she believes his client is lying, or will do so on the stand, and the California Rules of Professional Conduct do not prohibit free narrative testimony without the assistance of counsel.  Thus, the court analyzed whether that the use of that approach had denied the defendant effective assistance of counsel. (*Guzman, supra*, 45 Cal.3d at p. 944.)

The court found that counsel's conduct "closely followed that formerly prescribed by the American Bar Association (ABA) Project on Standards for Criminal Justice, Standards Relating to the Defense Function (Approved Draft 1971) standard 7.7.  That standard recognize[d] that, although counsel need not elicit what he thinks will be perjured testimony, an accused has an absolute right to testify over counsel's objection." (*Guzman, supra*, 45 Cal.3d at p. 944, fn. omitted.)  The court also noted that although the United States Supreme Court did not favor the free narrative approach, it had not condemned it as ineffective assistance.  (*Ibid.*)  The court further cited cases approving an attorney's "'passive refusal to lend aid to what is believed to be perjury' "which would include counsel's accepting a free narrative approach.  (*Id.* at pp. 945-946.)  In short, the court opined that the approach represented defense counsel's "best effort" to reconcile his duty to his client as defense counsel with his ethical obligation as an officer of the court.  Accordingly, the court found no ineffective assistance.  (*Id.* at p. 946.)

The court also concluded that defendant had not been forced to represent himself.  "Defendant was 'forced' to represent himself only with respect to his own direct testimony.  Counsel was available for and participated in all other stages of the trial.  Therefore, it was not necessary that the trial court's warnings about the dangers of self-representation be as complete as would be necessary for a defendant who sought to conduct his entire defense.  More important, the court expressly advised defendant of the dangers of the free narrative approach.  Defendant understood the dangers and had time to consider them before he insisted on testifying." (*Guzman, supra*, 45 Cal.3d at p. 945.)

In *People v. Gadson* (1993) 19 Cal.App.4th 1700 ( Guzman ), the defendant testified using free narrative against counsel's advice.  (*Id.* at p. 1705-1708.) On appeal, he claimed ineffective assistance because counsel acceded to his request to testify. Moreover, he claimed he was denied the right to counsel because he had to represent himself during direct examination, even though he had not asked to do so.  (*Id.* at p. 1709.)

The court found that defense counsel was required to allow the defendant to testify because the defendant had an absolute right to testify over the objection of counsel.  The court further opined that "defense counsel's refusal to participate in the presentation of perjurious testimony from the accused does not deny the client effective assistance of counsel."  (*Gadson, supra*, 19 Cal.App.4th at p. 1710.)  Relying on the analysis in *Guzman*, the court concluded that the free narrative approach "properly reconciled the competing interests which intersected in this situation.  Defendant was able to testify on his own behalf; trial counsel refrained from actively participating in the presentation of false testimony; defendant was still afforded the assistance of trial counsel; and the integrity of the adversarial system of justice was not compromised." (*Id.* at p. 1711; see *People v. Johnson* (1998) 62 Cal.App.4th 608, 630 [following *Guzman* and *Gadson* ]; *People v. Jennings* (1999) 70 Cal.App.4th 899, 907 [following *Gadson*].)

Ex. 6, Appendix A at 28-30.

**B.    Petitioner Was Not Denied Effective Assistance Of Counsel When He Was Required To Testify In The Narrative**

In *Nix v. Whiteside*, 475 U.S. 157 (1986), the United States Supreme Court held that the right to the effective assistance of counsel is not violated by an attorney who refuses to cooperate in presenting perjured testimony.  In *Nix*, a defendant on trial for murder told his attorney that he was convinced his victim had a gun, but he had not seen the gun.  Shortly before trial, however, the defendant told his attorney that he was going to testify that he had seen "something metallic" in the victim's hand.  The attorney informed the defendant that he could not suborn perjury, and that if the defendant insisted on committing perjury, he would notify the court and ask to withdraw from the case.  *Id.* at 160-61. When the defendant took the stand, he testified only that he "knew" the victim had a gun, but admitted on cross-examination that he had not seen it.  He was convicted of murder. *Id.* at 161-62.

The Supreme Court rejected the defendant's contention that his attorney's conduct deprived him of the right to counsel, holding that "the right to counsel includes no right to have a lawyer who will cooperate with planned perjury." *Id*. at 173.  "Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law." *Id.* at 166.  The Supreme Court also held that the right to testify does not include the right to testify falsely.  *Id.* at 173.  "For defense counsel to take steps to persuade a criminal defendant to testify truthfully, or to withdraw, deprives the defendant of neither his right to counsel nor the right to testify truthfully." *Id.* at 173-74.  *Nix* held that there was no ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. at 687.  *Id.* at 175.

With respect to what counsel should do when confronted with a client who intends to commit perjury, nothing in *Nix* disapproved the "free narrative" approach, whereby an attorney declines to assist in the presentation of perjury by having the defendant testify in the narrative, as in the instant case.  Indeed, the Supreme Court recognized that the "free narrative" approach has been approved by federal courts, including the this Circuit.  *Nix*, 475 U.S. at 170 n.6, citing *Lowery v. Cardwell*, 575 F.2d 727 (9th Cir. 1978).  Furthermore, the Supreme Court cautioned that "a court

1    must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so

2    restrictively as to constitutionalize particular standards of professional conduct and thereby intrude

3    into the state's proper authority to define and apply the standards of professional conduct applicable

4    to those it admits to practice in its courts." *Id.* at 165.

5          Here, the record shows that defense counsel refused to conduct an examination of

6    petitioner because he believed petitioner was going to commit perjury.  In a declaration submitted

7    by petitioner's trial court attorney in the habeas corpus petition filed in the California Supreme

8    Court, counsel stated,  "I did not present [petitioner's] direct examination because I believed ethical

9    reasons prevented me from doing so.  The ethical reasons were my disbelief of [petitioner's] alibi

10   and other statements." Ex. 6, attached Ex. 2, paragraph 3.  The declaration reflects that counsel

11   believed petitioner was going to commit perjury. [13/]

12         In light of the evidence that counsel believed petitioner was going to commit perjury, and

13   the Supreme Court's holding in *Nix* that counsel does not render ineffective assistance by refusing

14   to cooperate in the presentation of perjury, petitioner's claim fails.

15         Petitioner contends that the controlling Supreme Court precedent is *United States v.*

16   *Cronic*, 466 U.S. 648 (1984) rather than *Nix*. Petition at 6, Attach. at 15. In *Cronic*, the Supreme

17   Court stated that a trial is unfair for purposes of a defendant's right to the effective assistance of

18   counsel if he is denied counsel at a critical stage. *Id.* at 659.  Any argument that the Court should

19   presume prejudice under *Cronic* is without merit.  Petitioner has not identified any conflict of

20   interest or shown that trial counsel entirely failed to function as his advocate. *Id.* at 656; *see Bell*

21   *v. Cone*, 535 U.S. 685, 697-98 (2002) (*Cronic* applies only where counsel completely fails to subject

22   the prosecution's case to meaningful adversarial testing, not where counsel's alleged failure to do

23   so occurs only at specific points during trial; claims that counsel failed to submit mitigating evidence

24   and waived closing argument analyzed under *Strickland* standard); *Hovey v. Avers*, 458 F.3d 892,

25   906-07 (9th Cir 2006) ("*Cronic* requires wholesale failure by counsel to defend the client";

26

27   _____

28         13. It is doubtful that an attorney can ever know with certainty that his client will commit
     perjury.

1   *Strickland* standard applied to claim that counsel made prejudicial concessions in closing argument).

2   Furthermore, *Cronic* merely stated the general principle that a defendant has the right to the

3   assistance of counsel at a critical stage, while *Nix* held that a defendant does *not* have the right to

4   the assistance of counsel during the presentation of perjured testimony.   Thus, *Nix* implicitly

5   qualifies the general rule stated in *Cronic*.   Indeed, had the Court in *Nix* expressly considered the

6   issue, it no doubt would have concluded that the presentation of false testimony is not a "critical

7   stage" of the proceedings since a defendant has no right to testify falsely.  *See Nix*, 475 U.S. at 174

8   ("the accused enjoyed continued representation within the bounds of reasonable professional

9   conduct and did in fact exercise his right to testify; at most he was denied the right to have the

10  assistance of counsel in the presentation of false testimony").   Accordingly, *Nix* is the controlling

11  Supreme Court precedent, not *Cronic*.

12        In sum, the record simply does not support an argument that trial counsel refused to

13  examine petitioner for some improper purpose.  "Since there has been no breach of any recognized

14  professional duty, it follows that there can be no deprivation of the right to the assistance of counsel

15  under the *Strickland* standard."  *Nix*, 475 U.S. at 175.

16  **C.   Testimony By Petitioner In The Narrative, Rather Than In Question-and-answer**
17      **Form, Did Not Prejudice Petitioner**

18        Even assuming arguendo that counsel rendered deficient performance by requiring

19  petitioner to testify in the narrative, petitioner's ineffectiveness claim fails because he has never

20  established prejudice under *Strickland. Nix*, 475 U.S. at 175-76 (no prejudice under *Strickland* from

21  counsel's refusal to participate in presenting perjured testimony).

22        Under *Strickland*, it is the petitioner's burden to prove prejudice.  Prejudice exists where

23  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

24  proceeding would have been different.  A reasonable probability is a probability sufficient to

25  undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Here, there was no prejudice.

26  The record shows that petitioner was able to tell his story to the jury.  Petitioner testified that he did

27  not know Jones and did not sell drugs to her.  RT 3304, 3309, 3311.  He testified that he did not

28  shoot at Boykin, but actually "prevented" a more serious incident.  RT 3317-19, 3321-25, 3330.  He

1   testified that he had no knowledge of the shooting into Beverly Jones's home and would have been

2   asleep at the time it reportedly occurred.  RT 3347-48.  As to the murder of Jason Ewing and

3   attempted murder of Jaymes Lambert, petitioner stated that he was at home with his girlfriend,

4   friends and other family members when the shootings occurred, and testified that he first learned

5   about the murder two days after it happened.  RT 3358-61,65, 92, 93-94.  Petitioner stated that the

6   reason he went to a motel in San Jose was because his girlfriend wanted to visit a hospitalized friend,

7   and they stopped there en route to petitioner's mother's house.  RT 3397–99.  Petitioner ran from

8   the police in San Jose, because he had just learned from his mother, over the phone,  that he was

9   wanted in connection with the murder, which scared him.  RT 3399, 3402.

10          Thus, to the extent petitioner had a story explaining his innocence, he told it to the jury.

11  It would require pure speculation to conclude that the jury's verdict would have been different if

12  petitioner had presented his story in question-and-answer form rather than in the narrative.  *See*

13  *Cooks v. Spalding,* 660 F.2d 738, 740 (9th Cir. 1981) (mere speculation insufficient to establish

14  prejudice under *Strickland*).  Indeed, petitioner does not identify any testimony that he would have

15  presented had counsel conducted an examination of him, much less show that the presentation of

16  such testimony would have affected the verdict.

17          Accordingly, petitioner cannot show that the California Supreme Court's denial of the

18  Petition for Writ of Habeas Corpus was objectively unreasonable.

19                                          **III.**

20          **THE STATE COURT REASONABLY REJECTED PETITIONER'S
        NOTICE CLAIM IN GROUND THREE AS PETITIONER HAD NOTICE**

21          **OF CHARGES AGAINST HIM**

22          Petitioner was charged with the attempted murder of Jaymes Lambert.  CT 827-28.  In

23  California, the crime of attempted murder is not divided into degrees.  *People v. Bright,* 12 Cal.4th

24  652, 665-69 (1996).  However, the prosecution may seek a jury finding that an attempted murder

25  was "willful, deliberate, and premeditated" for purposes of sentence enhancement.  Cal. Pen. Code,

26  § 664, subd. (a); *Bright,* 12 Cal.4th at 669.  Petitioner challenges the enhanced sentence of an

27  indeterminate life term imposed for the attempted murder based on the jury's finding that it was

28  premeditated.  He contends that because the indictment and information did not allege that the fact

1   that the attempted murder was premeditated, he did not receive adequate notice that the prosecution

2   sought the enhanced sentence, and therefore, its imposition violated his rights to notice and due

3   process.  First Am. Pet. at 16-17.

4   **A.    The State Court Of Appeal Properly Concluded That There Was No Sixth**
    **Amendment Violation; Petitioner Had Actual Notice Of The Charges And The Jury**

5   **Was Properly Instructed**

6           The Sixth Amendment guarantees a criminal defendant the right to be informed of the

7   nature of the charges against him so that he made adequately prepare a defense to those charges.

8   *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *Gautt v. Lewis*, 489 F.3d 993, 1002 (2007); *Sheppard*

9   *v. Rees*, 909 F.2d 1234, 1236 (9th Cir.1990); *Gray v. Raines*, 662 F.2d 569, 571 (9th Cir.1981).  It

10  is well settled that criminal defendants may receive the notice required by the Sixth Amendment

11  from sources other than the accusatory pleadings.  *Murtishaw v. Woodford*, 255 F.3d 926, 954 (9th

12  Cir. 2001); *Morrison v. Estelle*, 981 F.2d 425, 427-28 (9th Cir. 1992).

13          In this case, the evidence supports petitioner had actual notice that the prosecution would

14  be proving premeditation even though the allegation was omitted from the initial grand jury

15  indictment, and petitioner received adequate notice of the allegations during the course of trial itself.

16  *Sheppard v. Rees*, 909 F.2d at 1236 n. 2.  At his first court appearance, petitioner pleaded "not

17  guilty" to violating California Penal Code § 664.  CT 833.  The claims and evidence in this case

18  were that appellant shot Ewing, then chased after Ewing's companion, Lambert, shooting at him as

19  well.  The California Court of Appeal reasonably rejected petitioner's notice claim as follows:

20          Here, the amended indictment/information did not expressly allege the "fact" that the
        attempted murder was premeditated, as required by section 664, subdivision (a).  It simply
21      accused defendant "of a felony, to wit, a violation of California Penal Code section
        664/187 (ATTEMPTED MURDER) . . ."  Although the reference to section 664 may have
22      raised the possibility that the prosecution was seeking the enhanced sentence for
        premeditation, it does not do so clearly and unequivocally.

23
            We further note that the verdict form for the attempted murder included an allegation
24      that the attempted murder was willful, deliberate, and premeditated and required the jury
        to decide whether the allegation was true.  After the verdicts were announced, the
25      prosecution submitted a statement in aggravation, arguing that under section 664,
        subdivision (a), the jury's finding of premeditation required the enhanced sentence of life
26      for the attempted murder.  And later, at sentencing, the court imposed the enhanced
        sentence in accordance with section 664, subdivision (a) and the finding of premeditation.
27
            Defendant did not object to instruction, the verdict form, the statement in
28      aggravation, or the sentence on the grounds that the indictment/information had not

1    pleaded premeditation and he lacked notice of that the prosecution would attempt to prove

2    it and obtain an enhanced sentence. Under these circumstances, defendant may not now
     complain of a violation of the statutory pleading requirement or his constitutional right
     to notice. (*People v. Bright* (1996) 12 Cal.4th 652, 740-741, overruled on other grounds

3    in *People v. Seel* (2004) 34 Cal.4th 535, 550.)

4        Moreover, assuming that Petitioner's constitutional right to notice was violated by the

5    failure of the prosecution to move to amend the indictment/information to include the "fact" that

6    petitioner committed the attempted murder willfully, deliberately, and with premeditation pursuant

7    to California Penal Code section 664(a), any error was harmless. *Gautt v. Lewis*, 489 F.3d 993,

8    1014-18 (9th Cir. 2007) (applying harmless error analysis to notice violation). State prisoners "are

9    not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual

10   prejudice,' i.e., that "the error 'had substantial and injurious effect or influence in determining the

11   jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see Fry v. Pliler*, 127 S. Ct.

12   2321, 2328 (2007).

13       Petitioner was accused of murdering Jason Ewing by directly shooting at him and then

14   immediately chasing after Ewing's companion Jaymes Lambert, shooting at him. As to both the

15   murder, and attempted murder, petitioner's defense at trial was mistaken identity, untruthful

16   witnesses, and alibi. RT 3352-55, 58-61, 65. Nothing concerning the defense strategy would have

17   changed had petitioner been expressly aware of the allegations by way of an amendment to the

18   indictment or information. Had petitioner been made expressly aware of the allegations by way of

19   an express amendment to the indictment or information, he would not have prepared any differently

20   or made any different tactical choices. *See Gautt v. Lewis*, 489 U.S. at 1016-17; *see also Brecht v.*

21   *Abrahamson*, 507 U.S. at 637-38.

22       As noted by the Ninth Circuit in rejecting a notice claim in a case where the prosecution

23   failed to allege in an information that the attempted murder had been committed deliberately:

24       It was not until well after trial that Petitioner came to realize that the information had not
         charged him with premeditated attempted murder. The prosecutor and the trial judge also
25       believed throughout the trial that the information had alleged premeditation. Therefore,
         the trial that transpired was no different from the trial that would have transpired had the
26       information set out premeditation and deliberation. On these facts, there was no prejudice
         to Petitioner and the error was harmless.

27   *Jones v. Smith*, 231 F.3d 1227, 1239 (9th Cir. 2001).

28

MPA In Support Of Answer - *Horne v. Horel* - C 07-4592 SBA (PR)

1    In this case, the jury was instructed with CALJIC No. 8.67, which was requested by

2 petitioner. CT 1154. CALJIC No. 8.67 discusses the finding of willfulness, deliberateness and

3 premeditation in connection with attempted murder. CALJIC No. 8.67 informs the jury that it must

4 determine whether the allegation that the attempted murder was willful, deliberate and premeditated

5 is true or not true. The instruction goes on to define, in some depth, the terms willful, deliberate

6 and premeditated. CALJIC No. 8.67 further instructs the jury that the prosecution bears the burden

7 of proving the allegation of willfulness, deliberateness and premeditation and if the jury is not

8 satisfied beyond a reasonable doubt of the truth of the allegation, the jury must find the allegation

9 not true. Finally, the instruction tells the jury it will be supplied with a verdict form that will include

10 a special finding on this issue.

11    The jury was given a verdict form that included a special finding on the issue as discussed

12 in CALJIC No. 8.67. CT 966. The jury found it to be true. Petitioner clearly had notice of the

13 charges against him, entered his plea understanding the charges, and submitted proper jury

14 instructions. Any error was harmless.

15 **B.   The State Court Properly Concluded There Was No Ineffective Assistance Of Counsel**

16

17    Petitioner argues that he received ineffective assistance of counsel because his counsel

failed to notice the omission or object. First Amend. Pet., attachment at 15. This claim was

18 reasonably rejected by the California Court of Appeal.

19

20    The record does not reveal the reason counsel did not object. Moreover, we do not
find the omission tactically unreasonable as a matter of law. Given the reference to

21 section 664 in the indictment/information, counsel could have understood from the start
that the prosecution was seeking to prove that both the murder and attempted murder were

22 premeditated. In other words, counsel saw no need to object to a technical inadequacy in
the pleading because defendant had notice. Indeed, given the great difference in the

23 punishments for attempted murder and attempted premeditated murder, we can conceive
of no other reason why counsel would fail to object to the instruction, the verdict form,

24 the statement in aggravation, and the sentence. Accordingly, on the record before us,
defendant cannot establish that counsel's omission fell below an objective standard of

25 reasonableness, and we reject his claim of ineffective assistance. (See *People v.
Cunningham, supra*, 25 Cal.4th at p. 1003.)

26 Ex. 6, Attachment A at 60.

27    To establish ineffective assistance of counsel, petitioner must show (1) his counsel's

28 representation fell below an objective standard of reasonableness; and (2) there is a reasonable

MPA In Support Of Answer - *Horne v. Horel* - C 07-4592 SBA (PR)

1   probability the result would have been different absent error. *Strickland v. Washington*, 466 U.S.

2   at 687-88. Petitioner makes no argument as to how his counsel fell below "an objective standard

3   of reasonableness" in this case. There is no showing of prejudice because petitioner was aware of

4   the charge against him and the jury was properly instructed on the elements of attempted murder,

5   including the allegation of premeditation. Moreover, where the evidence was that immediately after

6   killing Lambert's companion, petitioner chased Lambert down the street firing shots at him, the

7   deliberate and premeditated nature of the attempt could hardly be in doubt. He was hunting.

8       Accordingly, the California Court of Appeal decision denying petitioner's claim based

9   upon ineffective assistance of trial counsel was not contrary to or an unreasonable application of

10  clearly established federal law. 28 U.S.C. § 2254(d).

11                                **CONCLUSION**

12      Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

13  be denied.

14      Dated:  August 1, 2008

15                          Respectfully submitted,

16                          EDMUND G. BROWN JR.
                            Attorney General of the State of California

17                          DANE R. GILLETTE
                            Chief Assistant Attorney General

18
                            GERALD A. ENGLER
19                          Senior Assistant Attorney General

20                          GREGORY A. OTT
                            Deputy Attorney General

21

22                          /s/  Sara Turner

23                          SARA TURNER
                            Deputy Attorney General

24                          Attorneys for Respondent

25  20129750.wpd
    SF2008401053
26

27

28

MPA In Support Of Answer - *Horne v. Horel* - C 07-4592 SBA (PR)