IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOSEPH HORNE,               )    No. C 07-4592 SBA (PR)
)
         Petitioner,    )   **ORDER DENYING PETITION FOR**
)   **WRIT OF HABEAS CORPUS**
  v.                     )
)
ROBERT HOREL, Warden,    )
)
         Respondent.   )
_____ )

## INTRODUCTION

This matter is now before the Court for consideration of Petitioner's pro se amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2005 conviction in Monterey County Superior Court.  Respondent Robert Horel, Warden of the Kern Valley State Prison, opposes the petition.  Petitioner has filed a traverse.  For the reasons discussed below, the petition is DENIED as to all claims.

## BACKGROUND

### I.   Case History

On April 26, 2005, a jury in Monterey County Superior Court convicted Petitioner of: count 1, murder with a "criminal street gang" special circumstance and enhancements for discharging a firearm and causing great bodily injury or death and for committing the offense for the benefit of a criminal street gang (Cal. Pen.Code §§ 187, 186.22(b)(1), 190.2(a)(22), 12022.53(c)-(d))[1]; count 2, attempted murder with gang and firearm discharge enhancements (§§ 664, 187, 186.22(b)(1)); count 3, assault with a firearm with a gang enhancement (§§ 245(a)(2), 186.22(b)(1)); count 5, making criminal threats (§ 422); count 6, shooting at an occupied vehicle with a gang enhancement (§§ 246,

---

[1]All statutory references in this paragraph are to the California Penal Code unless otherwise specified.

186.22(b)(1)); count 7, sale or transportation of a controlled substance with a gang enhancement (Health & Saf. Code, § 11352; § 186.22(b)(1)); count 8, shooting at an inhabited dwelling with gang enhancements (§§ 246, 186.22(b)(1) & (b)(4)(B); and count 9, assault with a firearm with a gang enhancement (§ 245(a)(2), 186.22(b)(1)).  (Resp't. Ex. 1 at 336-43.)  Petitioner was acquitted of count 4, a second count of making a criminal threat (§ 422).  (Resp't. Ex. 6, App. A at 2 n.1.)

On October 13, 2005, the trial court sentenced Petitioner to state prison for a term of life without parole for the murder (count 1) plus a consecutive indeterminate life term for using a firearm; a consecutive indeterminate life term for the attempted murder (count 2) plus a 20-year firearm enhancement; a consecutive life term for shooting at an occupied vehicle (count 6); a consecutive life term for shooting at an occupied dwelling (count 8); a consecutive determinate term of three years for selling drugs (count 7) plus a four-year gang enhancement; and a consecutive eight-month term for making a criminal threat (count 5).  The trial court imposed additional terms and enhancements but stayed them under California Penal Code § 654.

On April 13, 2007, the California Court of Appeal reversed the conviction on count 5 (making criminal threats) on the grounds of instructional error, but affirmed the judgment on all other counts.  The California Supreme Court denied a petition for review and a petition for a writ of habeas corpus in separate opinions on June 25, 2007.

The instant petition was filed on September 5, 2007.  Petitioner then filed a superseding amended petition on March 24, 2008.  On March 27, 2008, Respondent was ordered to show cause. After receiving extensions of time, Respondent filed an answer and memorandum of points and authorities on August 1, 2008, and lodged a number of exhibits.  Petitioner filed a traverse on August 25, 2008.

**II.**   **Statement of Facts**

The following facts are taken from the opinion of the California Court of Appeal:

Defendant committed the offenses between January 31 and November 11, 2002.

**January 31, 2002-Sale of a Controlled Substance (Count 7)**
In January 31, 2002, members of a police drug enforcement team in Seaside arranged for Beverly Jones, an addict and paid informant, to make a controlled buy of cocaine from a dealer on Flores Street, where drug dealing

2

was suspected. After being searched and given money, Jones went to the area. The team observed defendant enter Jones's vehicle. A short time later, he got out. Jones drove to a predetermined location, where she met a member of the team and produced some rock cocaine that she had purchased from defendant.

**The Defense**

Defendant testified that he had accepted rides from Jones in the past. He could not recall this particular incident very well but thought it was the time he had flagged her down for a ride. On that occasion she had bought drugs from someone called "Muchee" before defendant got into her car. Defendant admitted that he had sold drugs in the past but denied selling to Jones that day.

**March 12, 2002-Shooting at an Occupied Vehicle (Count 6)**

On March 12, 2002, Marcus Boykin, a drug user with prior convictions for robbery and possession of drugs, drove another man to Flores Street to buy some crack cocaine. Later, Boykin returned and was confronted by a group of men, including defendant, who were angry about a "drug rip off." Four of them entered Boykin's car, and one threatened him with a gun. Boykin got out, and defendant, who had a big gun in his hand, asked about some drugs that Boykin's friend had not paid for. He punched Boykin, and then told him to leave. As Boykin drove away, someone fired shots at his car.

A short time later, Boykin told Officer Danny Martin of the Seaside Police Department that defendant had shot at him. He also told Officer Martin to get defendant off the street before he killed him. Officers Martin and Cruz Gonzalez located defendant at Latina Harris's home after the incident. Defendant denied having an altercation with anyone.

**The Defense**

Defendant denied shooting at Boykin's car. He claimed that he saved Boykin from being shot. He said that when the men jumped into Boykin's car, he told them to get out. Despite defendant's intervention, Boykin cursed him. Defendant then punched Boykin and told him to leave. At that point, a man put a gun to Boykin's head and demanded money before he left. Defendant snatched the gun away, and Boykin drove away. Defendant put the gun down, and the man retrieved it and shot at Boykin's car.

**July 22, 2002-Criminal Threats against the Welch Family (Count 5)**

On July 22, 2002, Gay Lavern Rhone, and her cousin Jimmy, who are members of the Welch family, were at the Nations Market. As Rhone came out of the store, she heard someone say something like "if I don't get my money, I'm going to blow or smoke the whole Welch family and starting with Lisa and the baby."[2]  She did not see the person, but when she turned, she saw defendant among others, and at trial she identified defendant as person who made the statement.

Rhone and Jimmy looked for and found Lisa and Lisa's father Samuel Welch at a car lot and conveyed the threat. All of them went immediately to the police station and reported the threat to Officer Gonzalez.

Officer Gonzalez interviewed Lisa. She explained that defendant had put a

---

[2]Alicia Welch, who also goes by the name Lisa, is Rhone's first cousin. At the time, Lisa was defendant's fiancée and pregnant. On November 28, 2002, she gave birth to their daughter J'Ryna D'Syre Horne.

down payment on a used vehicle, but later after she and defendant broke up, she returned the vehicle without getting a refund of defendant's money. Lisa thought defendant had "gone crazy ." She urged his arrest, wanted a restraining order, and intended to leave town. The next day, however, Lisa asked that the charges be dropped. She told Officer Gonzalez that her family had made the threat seem more serious than it was and had pressured her to make a report.

At the station, Officer Gonzalez also interviewed Samuel Welch. Samuel said that he had recently overheard defendant threaten Lisa on the phone. He said he would kill Lisa, her baby, and the whole family if he did not get his money back on a vehicle. At the time, Samuel took the threat seriously. He too asked Officer Gonzalez to arrest defendant.

At trial, Lisa explained that she returned the vehicle that defendant had paid for without getting a refund. Later, she was looking for another vehicle, when Rhone and Jimmy showed up and told her about defendant's threat. She said her family forced her to report the threat even though she did not take it seriously. She also denied that defendant ever threatened her over the phone. However, she admitted that she had previously testified about the telephone threat before the Grand Jury. She explained that she had been confused by and misunderstood the question.

Samuel Welch testified that he overheard defendant threaten Lisa on the phone. He said he reported the threat to Officer Gonzalez.

**The Defense**
Defendant testified that he bought Lisa a vehicle, but then she threatened to take it back. He said she was angry because he was spending more time with the vehicle than with her. At the Nations Market, he and Jimmy Welch got into a loud argument. He had called Lisa a "B" because she was trying to take his vehicle back, her father was letting her do it, and he was losing his money. Defendant said he and Jimmy called each other names and threatened to kick each other's "A." However, he did not threaten to kill anyone.

Defendant admitted that he and Lisa had argued over the phone about the vehicle. When she told him she had returned it, he threatened to kick her "A" if he did not get his money back. She responded that he would never see his child. They continued to argue and curse each other, and then he hung up. A few hours later, she met defendant and told him she had returned the vehicle and gone to the police.

**November 10, 2002-Shooting at an Occupied Dwelling & Assault (Counts 8 & 9)**
On the evening of November 9, 2002, Gene Alton Stewart, Samantha Smith, and Ollie Mitchell were at Beverly Jones's home in Seaside and then left. Stewart testified that around 1:00 a.m. the next morning, November 10, he, Smith, and Mitchell drove to Salinas to buy some crack cocaine.[3] Mitchell gave Stewart money, and Stewart bought the crack. Stewart then kept some it for himself and gave what remained to Mitchell. Mitchell was angry about

---

[3]At the time of trial, Stewart was serving a four-year prison term. He had two prior robbery convictions. He agreed to testify in exchange for the prosecutor's effort to obtain a one-year reduction in his prison term.

being short-changed and said that Stewart would have to deal with defendant when they got back to Seaside.

Later that day, Stewart encountered defendant and others at the Del Monte Manor apartments. Defendant said, "You must wanna die, messing with my cousin" and tried to punch Stewart. They fought until Stewart got the upper hand and some people broke it up. Stewart then left for his motel room. Thirty minutes later, defendant and Mitchell arrived and assaulted Stewart with a gun and beer bottle.

That night, Stewart was at Jones's house again smoking crack. At one point, he noticed defendant, Mitchell, and Samantha Smith approaching the house. Defendant appeared to have a gun. Stewart sneaked out through a side door when he heard someone ask for "Geno ."

Jones testified that there was a knock on her door, and when she asked who was there, Mitchell asked for Stewart. Jones said he was not there. Defendant then said he knew that Stewart was there. Jones said nothing and then three shots came through the house. Jones heard Smith say, "[L]et's get out of here." Jones called the police, and later saw defendant, Mitchell, and Smith watching her from a nearby hill as she spoke to an officer.

Jerry Smith, the mayor of Seaside, was awakened by gunshots that night. He looked outside and saw two black men and a white woman walk from Jones's residence, get into a small Nissan four-door silver/gray car, and drive away.

**The Defense**
Defendant testified that on November 9, 2002, he came home drunk, went to bed, and stayed in bed the next day. Later, he found out that someone named "Geno" had robbed his cousin. He admitted fighting Gene Stewart, but he said the reason was that Stewart had molested his 16-year-old cousin.

**November 11, 2002-Murder, Attempted Murder, & Assault (Counts 1, 2 & 3)**
The murder of Jason Ewing and attempted murder of Jaymes Lambert occurred early in the evening of November 11, 2002.

Sometime between 5:00 and 6:00 p.m. that day, Joy Price, her brother Jason Ewing, Jaymes "Nutty" Lambert, Charles Earle and some others were on the street outside the Ewing house on Darwin Street, which is known as "D-Block." At one point, defendant walked by with some associates and said "Mob." He then lifted both arms as if he were signaling a touchdown. Someone in Jason's group yelled back "PJ's." A short time later, Jason, Lambert, and Earle left for the Food Corner market on Noche Bueno Street and San Pablo Avenue.

Lakeylia Ross was outside the market. She testified that defendant and others were also there. At one point, Jason and Lambert walked by, and someone said, "There goes that nigger right there." Defendant then said, "About to go get my strap," which means about to go get his gun. He then left the market. Ross heard someone in the crowd say, "It's about to go down."

Deborah Harris, defendant's cousin, testified before the Grand Jury that she and her aunt were also at the food market. At one point, three men came up to them, and Harris warned them to "get off the corner before [they] got shot."

5

Although at trial she denied saying this, her high school math teacher, Dennis Alexander, testified that the day after the shooting, Harris told him that she had warned Jason to leave the market before he got shot.

Lakeylia Ross further testified that she left the market and walked up San Pablo Avenue. She saw Jason and Lambert talking to Carlette Wanton, Vantoinette Fraley, and a woman named Bianca. Ross heard someone warn Jason to leave the corner "because something bad was going to happen." Suddenly, a silver car drove up. Defendant got out, walked over to Jason, announced, "Seaside Mob," and then shot him in the chest, killing him. Ross later identified defendant as the shooter to Detective Barry Pasquarosa of the Seaside Police Department.

Gene Stewart, who had sneaked out of Jones's house the night before, testified that around 6:00 p.m., he went to the corner of San Pablo Avenue and Luxton Street with a gun because he intended to confront defendant. He saw defendant and Jason arguing at the next corner. He heard Jason say that defendant owed him money. Defendant replied, "Fuck that." He then pulled out a gun, which looked like a Glock, and shot Jason twice.[4]

St. Clair, the defense investigator, testified that six months before trial, Stewart told him that he did not witness the shooting. St. Clair also testified that he went to the location from where Stewart allegedly witnessed the shooting same date and time but two years later. According to St. Clair, it was too dark to see the features of a person a block away.

Vantoinette Fraley testified that while she was talking to Lambert, she heard some shots. She did not recall telling her friend Carlette Wanton anything about the shooting. Nor did she recall telling Tracy Spencer, an investigator for the District Attorney, during a taped interview, that Wanton had said that a man pushed her out of the way before the shooting and later identified the man was "J.D." However, Fraley said she had no reason to lie to Spencer and had been honest.

Fraley did not recall seeing a Lexus or telling Spencer that she had. She said she did not know defendant before the trial and did not see him during the incident. However, Spencer testified that during her interview, Fraley recognized a photograph of defendant and referred to him as J.D. She also told Spencer that moments before the shooting, she saw a silver Lexus and then heard a car door slam shut.

Carlette Wanton initially denied that she and Fraley witnessed the shooting. She admitted that shortly after the shooting, she told an officer that she and Fraley had been there. However, she said that was a lie. She denied getting gun powder burns, telling Spencer about the burns, or telling an officer had seen fire from the gun. However, after hearing a tape of her interview, she acknowledged her presence at the scene and answered questions about who had been there and what she had seen. She testified that at one point, Jason came over to her, and then suddenly a dark-skinned man in dark clothing, a beanie hat, and hooded sweatshirt shot Jason. She saw fire and heard two shots. She did not know the shooter and said defendant was not there.

---

[4]Stewart admitted that when police questioned him about the incident, he said he did not know anything. He explained that he lied because he did not want to be known as a "snitch."

6

Wanton denied that defendant had pushed her out of the way or ever saying that he had done so. She acknowledged that that was what Fraley had told Spencer, and she admitted telling Spencer that "[i]f that's what [Fraley] says happened, I guess that's what she saw." However, she explained that she was not admitting that defendant pushed her but only that that is what Fraley thought had happened.

Jaymes Lambert testified that on November 11, 2002, he and Jason were talking to some girls when he heard two loud "booms" behind him. He did not see the shooter. He ran and more shots were fired at him. Brandon Rubin and Andrew Gil, who were on the street at the time, saw a black man in a blue sports jersey chasing after and shooting at another black man.

Lambert testified that he knew defendant only by sight and did not see him that evening. However, Lambert identified himself in a photograph the included himself, defendant, Lisa, and Jason's brother Jared Ewing in a friendly pose.

Lambert opined that there are no longer gangs in Seaside known as PJC or the Mob. He said they had stopped being active years ago, and now everyone got along. However, he admitted that he told Detective William Clark of the Monterey Police Department that he had been in PJC since he was 14 or 15, but he said that was a lie. Lambert admitted that after the shooting, he got a bone tattoo of the letters "H" and "T" on his arms. He claimed it stood for "Hard Times" and not Hilltop.

Scot Armstrong, a senior criminalist and ballistics expert with the California Department of Justice, analyzed shell casings recovered from both Beverly Jones's house and the murder scene. All were the same caliber and had been fired from the same gun, which, he opined was a Glock.

Defendant's fiancée Lisa Welch, Elizabeth Gadson, and her daughters Pasia and Alaina testified that on November 11, 2002, Lisa took Pasia and Alaina shopping for baby things and then returned to Lisa's apartment. Pasia and Lisa testified that some other people were there.

Lisa testified that after they returned, defendant went outside to get some marijuana from his friends. Later, he assembled a baby stroller and bassinet in their bedroom. Lisa said that defendant did not leave the apartment, except to have a smoke out on the balcony. She said that around 6:45 p.m., Elizabeth Gadson arrived to get Alaina and Pasia. Gadson testified that she did not see anyone outside when she arrived. Lisa said that after Gadson left, she drove some friends home, shopped, and came home to find defendant watching a movie.

Detective Joseph Bertaina of the Seaside Police Department, who interviewed Lisa, testified that she told him that defendant was in and out of the apartment during an impromptu baby shower. At sunset, he came in and never left. However, Lisa later corrected herself when Detective Bertaina told her that Pasia had said that defendant was never in the apartment. Lisa then said that defendant was not actually in the apartment but rather outside smoking and talking to his friends. She knew he never left because she checked on him every 15 minutes.

At trial, Lisa acknowledged some of what she had said to Detective Bertaina. However, she denied hearing what Pasia had said or saying that defendant had

been outside the apartment. She did not recall saying that she had checked on him every 15 minutes.

Pasia and Alaina testified that defendant was in and out of the apartment while they were there. However, Gary St. Clair, a defense investigator, testified that Pasia told him that she saw defendant only before she went shopping with Lisa and not when they returned later in the afternoon. He testified that Alaina told him she did not see defendant before her mother came to get her and Pasia. She also told St. Clair that there was no baby shower that day. At trial, Alaina said she may have said those things to St. Clair and admitted that her memory was better during that interview. Nevertheless, she was certain that she saw defendant at some point that day.

Detective Bertaina also interviewed Pasia. He asked her whether defendant had been at the apartment between 4:30 and 6:45 p.m. She said no. At trial, Pasia admitted saying that. However, she also testified that she saw defendant sometime somewhere that day.

Samuel Welch testified that he saw Pasia, Alaina, and defendant at the apartment. However, Detective Pasquarosa interviewed Samuel, who at that time said he saw Pasia, Alaina, and Lisa but not defendant during the day. Welch further said that defendant might have returned later that night, but he did not see him.

Trish Monta testified that on November 13, 2002, two days after the shooting, she drove Lisa and defendant to a hospital in San Jose to visit Monta's daughter Amber. She said that Lisa got a call at the hospital and learned that defendant had been accused of killing Jason. Lisa became upset and said the accusation was not true. Monta advised Lisa and defendant to go to the police. Monta further testified that at home later that evening, she saw defendant's picture on TV and called Lisa. Lisa became hysterical. Monta again advised her to go to the police.

Lisa testified that after they returned from visiting Amber, she and defendant drove back to San Jose and stayed overnight in a motel. She explained that she previously had talked to Amber about visiting her the next day, and she and defendant also and had plans to visit his mother in Barstow.[5] Lisa denied getting a call at the hospital about defendant. She also denied discussing the call with Monta either at the hospital or later that evening over the phone. Lisa testified that she did not learn that defendant was a suspect until November 14, 2002, when defendant was arrested.

On November 14, 2002, around 8:00 a.m., Officer David Lee of the San Jose Police Department drove by the California Motel in San Jose. He saw a man and a woman near a car that was sought in connection with Jason's murder. He broadcast a description of a man. When Officer Bill Wolf of the San Jose Police Department spotted a man who fit the description, the man ran. Police pursued and arrested the man, who was defendant.

Jeff Hass, an evidence technician for the Seaside Police Department, searched Lisa's Nissan Sentra. Among other things, he found photographs of defendant

[5] Monta testified that when they were all at the hospital, Lisa did not talk to her about returning the next day to visit Amber again.

and Lisa, one of which showed defendant sitting on a couch throwing a gang sign; a blue "Cowboys" sports jersey with the number "eight" and the name "Aikman" on it; and two cameras containing film. Pictures from one camera are dated November 4, 2002, and from the other November 11, 2002. One picture shows money and what appears to be a Glock on Lisa's stomach. Pictures dated November 11, 2002, show defendant and a baby bassinet. Hass also found an invitation to a baby shower on October 11, 2002.

Detective Bertaina testified that during his interview with Lisa he showed her the photograph of the gun and money. He testified that she was stunned and stuttered. She said that a man had come to the apartment to sell it. At trial, Lisa testified that a man and a woman, whom she did not know, came by one night to sell defendant some marijuana. At one point, the man put a gun in her lap, said he was selling it, and then grabbed her camera and took the picture of it.

Detective Bertaina also interviewed defendant. During the interview defendant said he "hung out" at and was "a main factor" in the area of San Pablo Avenue at the Food Corner market, which he called "the block." He said he was friendly with Jared Ewing but not Jared's brother Jason. He reported that Jared had recently shot at Stefan "Poppa." Guest. Defendant said he had heard "on the street" that Poppa and Raishat "Geno" McGill were suspects in Jason's murder. He told Detective Bertaina that Gene Stewart was a "base head," who had robbed Ollie Mitchell.

Defendant told Detective Bertaina that on November 11, 2002, he spent the entire time from 5:00 to 8:00 p.m. at Lisa's baby shower along with his Aunt Marilyn Hall, Patience Davis, Peggy and Kathy Hunter, and Pasia Gadson.

On November 15, 2000, before defendant made his first court appearance, he called his cousin "Angel" and Gary "Sweet" Dunn from the Monterey County Jail. During the call, defendant said he was "The famous MF on the block" and advised, "Hey, you need to talk to Vantoinette, man," "and Carlette," and "be up on them," which, Detective Bertaina understood to mean "be close to them, get up on them, next to 'em."

**The Defense**
Defendant testified that on November 11, 2002, he was at the Food Corner market early in the afternoon, and then he and some associates walked passed a group of people outside the Ewing house. He said that as he passed, he said, "what up, this is mob" to reassure them and prevent a shooting.

Later, around 2:45 p.m., he went to Lisa and her father's apartment. Lisa had just left to go shopping. He stayed there the rest of the day. Between 5:00 and 5:30 p.m., he assembled a stroller. Around 5:45 p.m., a friend came over with some marijuana for him. Around 6:00 p.m., he and Shantay Huntley went out on the balcony and had a smoke. Later, he and Alaina Gadson assembled a bassinet. Shortly after 6:30 p.m., Pasia and Alaina left with their mother, and Lisa left with Shantay and Christina Edwards.

Defendant further testified that on the morning of his arrest, Lisa made a call from their motel to find out what hospital Amber was in, and defendant went outside to call his mother from a pay phone. His mother told him that he was suspected of murder. Just then, a police car drove by. Defendant told Lisa to leave for the hospital, and he left to go to the store. He later ran and was eventually caught and arrested.

9

Concerning the photograph of the gun on Lisa's stomach, defendant said that one night, a man named Mark was supposed to sell him some marijuana, but he could not deliver and sent someone else. The man came over with his wife and sold them a "sack." Defendant went into another room with Lisa's father, and Lisa handled the transaction by herself. After the couple left, Lisa told defendant that the man had tried to sell her a gun, and she had taken a picture of it.

Defendant testified that he had had a brief affair with Lakeylia Ross, and thereafter, she kept "hounding" him to be with her, saying she could love him better than Lisa could. However, he "ditched her."

Defendant denied that he called Angel and Sweet from jail to have them influence Carlette Wanton and Vantoinette Fraley. He said he simply wanted his friends to find out what they had said. At the time, he had already heard that Stefan "Poppa" Guest was the perpetrator.

Defendant said there were no problems between him and Jason. However, he admitted that after the shooting, he was very angry that Jason had called Lisa in the past and that in the past, they had had sex. Defendant admitted that he told his sister to assault Lisa and had angrily threatened to assault her himself. He further admitted that when Lisa said she loved him, he repeatedly told herd that he was "a boss," and everyone knew it. At trial, he explained that he was angry about a rumor that Jason had been sleeping with Lisa. He denied that he was angry because Jason was not a Mob member

Shantay Huntley testified that she is a very close friend of both defendant and Lisa. She said that she attended two baby showers for Lisa. The second one was at Lisa and her father's apartment. She arrived between 2:00 and 3:00 p.m. Some associates of defendant were there, but she did not know their names. Defendant was in the bedroom assembling a stroller and a bassinet. Around 6:00 p.m., she and defendant went outside to have a smoke.

**Gang Testimony**

Detective William Clark of the Monterey Police Department testified that in Seaside, gang members are mostly "Crips." Their rival, the Bloods, have only a small presence. He explained that there are different Crip "factions or sets," some of which identify with Seaside locales, such as "D-Block," which is the area around Darwin Street; "the Projects," which is near the Del Monte Manor Apartments housing project; and "Hilltop," which is just below apartments, in the area around Lucerne and the Nations Market. Hilltop is a set of Project Crip-i.e., "Hilltop Project Crip[s]" or "Hilltop PJC." In 2002, the two main Crip factions were "Project Crip" and the "Mob" or "Seaside Mob."

Detective Clark opined that Project Crip and the Mob both qualified as criminal street gangs as defined by statute. He explained that that both claim the color blue and use hand signs to greet fellow members or intimidate and threaten rivals. The Mob uses hand signs for "M" and "C"; Project Crip uses signs for "P" and "C." He identified a photograph of defendant making Mob had signs. In another photograph, he identified Jared Ewing and Lambert making Project Crip signs.

Detective Clark testified that a truce between the Mob and Hilltop PJC collapsed in August 2002 because of a shooting between Jared Ewing, who was PJC, and Stefan "Poppa" Guest, who was Mob. Thereafter, hostilities between the two gangs increased. He opined that the shooting of Jason

benefited [sic] the Mob.

Detective Clark interviewed Lambert and listened to several of Lambert's tape-recorded telephone calls. He opined that Lambert was Hilltop PJC, and his "H. T." tattoo signified Hilltop PJC. Although Lambert asserted that defendant had shot Jason for personal, not gang-related, reasons, Detective Clark noted that in the recorded calls, Lambert made a reference to the Mob, and before the murder, Lambert had warned Jason.

Sergeant Michael Kimball of the Seaside Police Department testified that Mob stood for both "murder on Broadway" and "money over bitches." He explained that in the mid-1980's, Crips from Los Angeles came to Seaside to expand their criminal activities. They formed the "Project Crips" or "PJC" at the Del Monte Manor. Over time, infighting developed between the young Seaside members, who wanted independence, and the older members. The former members split off as the Mob; the latter became "FAM," or "original family gangsters." The two factions fought; but in 1998, they reached a truce concerning drug trafficking. In 2000, the truce fell apart, violence erupted between the factions, and both FAM and the Mob started recruiting new members. At that time, Project Hilltop or Hilltop and D-Block developed as subsets of FAM. Hilltop or Hilltop PJC was still an active gang in 2002 and friendly with D-Block, where Jason lived.

Sergeant Kimball concurred with Detective Clark that the Mob was a criminal street gang, whose primary activities included murder, robbery, burglary, assaults, car jacking, prostitution, witness intimidation, firearm brandishing, drugs trafficking, and gambling. He testified that defendant was an active member of the Mob gang. He based his testimony on contacts with defendant; defendant's statements to police officers, including that he was "the most famous MF out there on the block" and a "main factor"; defendant's writings and calligraphy, which include "My book, J.D., the Life of ah Boss," and "Names of People I know in Seaside," which appeared to be a roster of people and their individual status or relationship; defendant's blue clothing and gang-related tattoos; photographs of defendant making gang signs; and information from other officers, police reports, and CYA records. He said that defendant had also been a member of the "Village Park Crips" in Barstow.[6]

Sergeant Kimball testified that defendant committed each of his crimes for the benefit of the Mob. He explained that the crimes helped perpetuate his reputation as a boss of his turf in Seaside, generate self-esteem among gang members, provide money to support the Mob's activities, and let members of the community and rival gangs know "this is what's going to happen to you" if you do not cooperate, if you testify against us, and if you "mess" with us. He also asserted that the crimes also help recruit new members and teach the younger Mob associates how things are done.

Sergeant Kimball opined that when defendant called Angel and Sweet from jail and said to "be up on" Vantoinette and Carlette, he meant "to have a

---

[6]Sergeant Kimball listed several factors on which police determine gang membership: whether a person has admitted gang membership, has gang tattoos, wears gang clothing and colors, uses gang hand signs, has been seen with known gang members or participated with them in criminal activity, has been photographed with gang members, possesses gang related writings or drawings, appears on gang rosters, and frequents gang locations. Police also rely on documentary information that indicates gang membership.

11

watchful eye on them" and make sure they did and said what they were supposed to.

The parties stipulated that Tommy Clewis and Troy Caldwell had pleaded guilty to a robbery on March 9, 2000, on Darwin Street. At the time, Caldwell was wearing blue clothing, a cap with PJC Hilltop on it, and claimed he was "PJ Crip." The parties also stipulated that Daniel Kidd, Jacoby Morales, and Leonard Hobson had robbed a Seaside merchant at gunpoint. Detective Clark testified that he has seen gang videos in which Kidd claimed Mob membership. He had also seen photographs of Kidd making Mob hand signs of an "M." He further had heard reports from other officers concerning Kidd's association with other Mob members. Detective Clark opined that both robberies were committed for the benefit of Seaside Crips.

The parties also stipulated that on March 26, 2002, five men from Seaside-Trunell Butler, Chato Geronimo, Robert Daniels, Yohance Jones, and Paul Roy-robbed a bank in San Jose and were later convicted of that crime. Daniels had a Seaside PJC tattoo on his arm. Sergeant Kimball opined that the crime was committed to benefit the "Seaside Mob" because at least four of the perpetrators were from Seaside and "were part of the origination or the transformation between Project Crips and Mob [that] took place. They are all part of that." He also noted that they had gotten their vehicle from Sherray Pope, who was "part of Project Crips, who [had] then split off and created his own gang called Bay Ocean Pimps," which maintained friendly ties to Project Crips.

The parties stipulated that Antonio Parker, Tobias Jones, and Michael Gruber possessed crack for sale and sold it on August 4, 1999, in the area near the Food Corner Market in Seaside and were convicted of that offense. Sergeant Kimball opined that the offense was committed for the benefit of Seaside Mob or Seaside Crips because Parker and Jones were known Seaside Crips, Jones associated with the Mob, they had a blue jacket in their car, they had been observed in Mob territory selling drugs, and they were caught doing so.

The parties also stipulated that Michael Dean Johnson had been convicted of transporting crack for sale. Sergeant Kimball opined that Johnson had committed the offense for the benefit of Seaside Mob or Seaside Crips because Johnson "was part of Project Crips, part of the transformation when the Crips went from Project Crips to C-Town and the C-Side and Seaside Mob and ... FAM." Moreover, Johnson was still considered friendly with the Mob or claimed the Mob, even though he and defendant had sometimes fought each other. Sergeant Kimball also acknowledged that Johnson was associated with Bay Ocean Pimps, which claimed to be a set of the Bloods, the Crips' traditional enemy.

**Defendant's Testimony about Gangs and his Background**

Defendant testified that he joined the Seaside Mob in 1994 and was an active member along with Frank James, and Sheron "C-Ron" Tinsley. He denied that the Mob meant "murder on Broadway." Although he agreed that the Mob was a criminal street gang, and gangs commit crimes, he could not say what crimes Mob members had committed, except for selling drugs, and even then, he could only speak for himself, admitting that he had sold crack cocaine. Before the joining the Mob, he had been a member of the "Westside Village Park" gang in Barstow.

Concerning the history of the Mob, defendant explained that initially there

12

was only the "Projects" gang, and everyone in Seaside was a Crip. However, the Projects splintered after a drug dealer was killed. Two Crip gangs emerged: "C-Town Mob," which later became "Seaside Mob" and the "Seaside Family" or FAM. The two gangs started "going at it," and by the end of 1994 and 1995, "you had murders, shootings everywhere," including the murder of his friend Michael Butler, who was only 15.

During that period, defendant was committed to the juvenile hall and then California Youth Authority (CYA), where he took victim awareness classes.[7] At CYA a woman named Charlotte helped broker a peace treaty between older Project Crip members and the Mob. Jared Ewing was at CYA with him, and they became friends.

In 2001, after his release from CYA, defendant went to Seaside, where he was friendly with Mob members and others, including Jared, who was from D-Block. His wide associations explained the pictures of him and Jared, in which they are together "throwing up" an "M" for Seaside Mob and "C" for Project Crip.

Defendant explained that Mob members traditionally habituate San Pablo Avenue and an area on Fremont called "plaza." However, there are no exclusive Mob areas, although there are places where FAM people do not want to go because of the potential for violence. The Project's territory was around the Del Monte Manor projects, and Hilltop "kicked it" at Nations Market. Defendant personally spent time at Nations Market, D-Block, and Noche Buena Street, where many different people sell drugs.

Defendant testified that his tattoo-"It's Nothing to a Boss"-is a line from a rap song and had no gang meaning. He said the phrase is inspirational and helped him keep in touch with his inner boss to overcome hardship. His tattoo of a disheveled "bum" throwing an "M" sign represented the hard circumstances he lived in, and the "M" represented "the gang that's within my life, too."

Defendant testified that when he referred to himself as a "main factor" on the block to Detective Bertaina, he only meant that many people know him; he did not mean that he was a gang leader or boss. He said there are many main factors on the block.

(People v. Horne, 2007 WL 1098684 at *2-12 (Cal. Ct. App. 2007) (footnotes in original).)

## DISCUSSION

## I.   Legal Standard

### A.   Standard of Review for State Court Decisions

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may

grant a petition challenging a state conviction or sentence on the basis of a claim that was

"adjudicated on the merits" in state court only if the state court's adjudication of the claim:

---

[7]On cross-examination, defendant admitted that before he went to CYA, he had robbed an 11-year-old by saying he had a gun. He was committed to CYA after being arrested and found in possession of a sawed-off rifle, ammunition, a ski mask, and rubber gloves.

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

### 1. Section 2254(d)(1)

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of  clearly established Federal law, as determined by the Supreme Court of the United States."  Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

### a. Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  Id.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the

state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court.  Williams, 529 U.S. at 391.  There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established."  Andrade, 538 U.S. at 64-65.  When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework.  See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established."  Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

### b.    "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 413.  A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  Williams, 529 U.S. at 406.  Such a case should be analyzed under the "unreasonable application" prong of § 2254(d).  See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

### c.    "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 412-13.  "[A] federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard.  Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point).  After Andrade,

> [t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them.

Id.  In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

## 2. Sections 2254(d)(2), 2254(e)(1)

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts

16

the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).  In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  Id.  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)."  Taylor, 366 F.2d at 1000.

When there is no reasoned opinion from the highest state court to consider the Petitioner's claims, the Court looks to the last reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  Here, the California Court of Appeal was the highest state court to issue an explained opinion on Petitioner's claims.

## II.    Exhaustion

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

federal court.  See 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987).  It is undisputed that Petitioner exhausted his state court remedies as to the claims raised in his petition. Specifically, Petitioner exhausted all three of his claims on direct appeal.

**III.     Legal Claims**

Petitioner raises three claims of ineffective assistance of counsel: (1) that was counsel was ineffective when he failed to make any objections when the prosecutor cross-examined Petitioner; (2) that counsel was ineffective in deciding not to conduct a direct examination of Petitioner, leaving Petitioner to give his testimony in narrative form; and (3) that counsel was ineffective in failing to object to the omission in the indictment and the information of a sentence enhancement factor on the attempted murder charge.

**A.     Standard of Review**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under professional norms.  Id. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 694.  Where the defendant is challenging his conviction, the appropriate question in determining prejudice is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" Luna v. Cambra, 306 F.3d 954, 961 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 695).

**B.     Cross-Examination**

Petitioner claims that counsel was ineffective because he did not make any objections during the prosecutor's cross-examination of Petitioner.  When Petitioner decided to testify, against the

18

advice of counsel, counsel did not present Petitioner's testimony because his professional ethics required him not to present what he believed would be perjured testimony by Petitioner. (Resp't. Ex. 6 at Ex.2 ¶ 3; Ex. 2 at 3261-65; 3273-74.) Consequently, Petitioner presented his testimony in narrative form, and although counsel raised objections when the prosecutor cross-examined other witnesses, counsel remained quiet during the prosecution's cross-examination of Petitioner. (Id.; Horne, 2007 WL 1098684 at *16.)

The California Court of Appeal found that counsel was correct in deciding that ethical considerations prevented him from presenting what he believed would be perjured testimony by Petitioner. (Id. at *16-18.) The Court of Appeal found, however, that such ethical concerns did not require, or justify, counsel's not participating during cross-examination because raising objections would not have required him to present false testimony. (Id. at * 18.) Consequently, the Court of Appeal concluded that counsel was objectively unreasonable, and deficient under Strickland, in failing to make any objections during the cross-examination of Petitioner. (Id.)

This Court need not address whether the Court of Appeal reasonably found counsel's performance to be deficient because the Court of Appeal went on to find that counsel's performance was not prejudicial in a perfectly reasonable analysis. (Id. at *19-*25.) A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. Strickland, 466 U.S. at 697; Williams v. Calderon, 52 F.3d 1465, 1470, n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice). The California Court of Appeal thoroughly analyzed prejudice as follows:

> Defendant lists over 40 allegedly improper questions and 80 objections to them that counsel should have made. As noted, to establish prejudice from counsel's omission, defendant must demonstrate a reasonable probability that the some or all of the objections would have been sustained and that he would have obtained a more favorable result had the objections been made and sustained. (Strickland v. Washington, supra, 466 U.S. at ¶. 688, 694.)

> Defendant does not argue the merits of most of the objections that he claims should have been made. He simply notes the question and lists the grounds for objection. As we discuss below, most of defendant's objections would have been overruled; and as to those that had merit, counsel's omissions were harmless.

> Defendant's primary substantive complaints concern gang-related questions, improper impeachment, hearsay, and relevance.

19

Before discussing those complaints, we note that when a defendant elects to take the stand, the prosecutor is entitled to disprove his or her direct testimony. (People v. Rowland (1992) 4 Cal.4th 238, 275.) To this end, the trial court must afford the prosecutor wide latitude during cross-examination, especially on the issue of credibility, and allow questions on any matter within the scope of direct examination. (People v. Harris (2005) 37 Cal.4th 310, 335; People v. Guttierez (2002) 28 Cal.4th 1083, 1148; Curry v. Superior Court (1970) 2 Cal.3d 707, 715; see Evid.Code, § 773.)[8]

In People v. Chatman (2006) 38 Cal.4th 344, the court explained, "The permissible scope of cross-examination of a defendant is generally broad. 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them. [Citation.] A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. [Citation.]' [Citation .]" (Id. at p. 382, quoting People v. Cooper (1991) 53 Cal.3d 771, 822.)

With this in mind, we observe that during his narrative testimony, defendant responded to the prosecution's gang experts. Based on his years of experience with different gangs and gang members, he offered his own history, views, and opinions concerning the various Seaside gangs, his own gang the Mob, different gang areas, gang signs and colors, and gang memorials.

Concerning the cross-examination on his gang testimony, defendant claims counsel should have objected to questions that treated him as if he were a gang expert and sought his lay opinion concerning different subjects and hypothetical scenarios. Specifically, defendant complains of questions about whether the gangs he had been in-i.e., the Mob and Westside Village Park-were criminal street gangs; whether the Mob's primary activities involved committing the various crimes enumerated in the gang statute; whether the Mob stands for "murder on Broadway" and relates to the murder of a particular Mob member; what crimes Mob members have committed; whether gangs intimidate witnesses to their crimes; whether helping police is against gang philosophy; whether gang killings are important to the gang; whether gang members do senseless things, including killings, for the benefit of their gang; whether gang members lie to or misinform the police about gang crimes; and whether a gang member will have backup support for a shooting.

With one exception, we reject defendant's claim. The subject matter of the prosecutor's questions fell well within the scope of defendant's narrative testimony and properly sought to expose the extent of his knowledge and thereby undermine his credibility concerning gangs, their members, and their history, especially concerning the Mob. Many of the questions properly sought a lay opinion that was rationally based on defendant's own experiences and perceptions. (See Evid.Code, § 800.) And insofar as some questions sought an expert-type opinion, we do not find them objectionable because defendant assumed that he was qualified to answer all of the questions; and in doing so without hesitation, he, in effect, qualified himself as his

---

[8]Evidence Code section 773, subdivision (a) provides, "(a) A witness examined by one party may be cross-examined upon any matter within the scope of the direct examination by each other party to the action in such order as the court directs."

own gang expert.[9]

Defendant argues that the gang questions were prejudicial because they implied that he was familiar with gangs and gang related crimes, including specific killings. However, it was not so much the prosecutor's cross-examination that demonstrated defendant's familiarity with gangs, their activities, and crimes as defendant's own direct testimony.

We agree with defendant that asking defendant whether the Mob was a "criminal street gang" was objectionable because the prosecutor was implicitly using the phrase in its technical sense as defined in section 186.22 and as Detective Clark and Sergeant Kimball had used it. However, the prosecutor never established a proper foundation for the question-i.e., whether defendant knew and understood that statutory meaning of the phrase. Defendant claims counsel's failure to make a "foundation" objection was prejudicial. He argues that in agreeing that the Mob was a criminal street gang, he inadvertently admitted an essential element of the gang special circumstance allegation and enhancement allegations.

The jury was instructed that to find those allegations true, it had to find that defendant acted for the benefit of a criminal street gang; and to make that finding, the jury had to make various preliminary and prerequisite factual findings concerning the existence of a criminal street gang, its primary activities, and its pattern of criminal conduct. The jury was also instructed that in making these factual determinations, it could rely on expert testimony.

Detective Clark and Sergeant Kimball discussed the legal definition of a criminal street gang. They also provided factual bases for their conclusions concerning the Mob's primary criminal activities, its pattern of criminal conduct, and its qualifications as a criminal street gang as well as their conclusions that defendant committed his crimes for the benefit of the Mob.

In contrast, defendant offered little, if any, testimony to support the underlying factual findings necessary to show that the Mob's primary activities involved committing enumerated crimes or that the Mob has engaged in a pattern of criminal activity. Indeed, when asked whether the primary activities of a "criminal street gang" include the offenses listed in the statute, defendant answered, "That's not what it takes to be a gang," indicating that he did not understand the legal definition of a criminal street gang.

Given the strong, uncontradicted testimony of the prosecution's gang experts, we do not find a reasonable probability that defendant would have obtained a more favorable result concerning the gang allegations had counsel raised a foundation objection to the prosecutor's question, had the court sustained the objection, and had defendant not answered it.[10] (Strickland v. Washington, supra, 466 U.S. at ¶. 688, 694.)

---

[9]At one point the prosecutor stated, "You're the expert. You designated yourself as an expert, sir."

[10]The prosecutor also asked defendant if defendant's former gang in Barstow-the Westside Village Park Gang-was a criminal street gang, and defendant said it was. The failure to make a foundation objection to that question and answer was also harmless because there was no evidence, argument, or attempt to prove that defendant committed his offenses for the benefit of that gang. Indeed, the prosecution experts did not discuss that gang except to say that defendant had previously claimed membership.

21

Defendant also complains that counsel should have objected to the prosecutor's use of his juvenile adjudications for impeachment. However, most of the prosecutor's questions properly focused on the nature of defendant's juvenile misconduct rather than the fact of a juvenile adjudication.[11] (See People v. Lee (1994) 28 Cal.App.4th 1724, 1740 [prosecution may introduce prior juvenile misconduct for purposes of impeachment]; Cal. Const., art. I, § 28, subd. (f) ["Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment ..."]; see also In re Manzy W. (1997) 14 Cal.4th 1199, 1209 .)[12]

Defendant's reliance on People v. Allen (1986) 42 Cal.3d 1222 (Allen), People v. Sanchez (1985) 170 Cal.App.3d 216 (Sanchez), and People v. Jackson (1986) 177 Cal.App.3d 708, 711-713 (Jackson) is misplaced.

In Allen, the court stated that in introducing a prior felony conviction to impeach a witness, counsel may not inquire into the underlying details of the offense unless they are relevant for some other legitimate purpose. (Allen, supra, 42 Cal.3d at p. 1270.) Moreover, Allen predates the court's decision in People v. Wheeler (1992) 4 Cal.4th 284, where the court recognized that evidence of misconduct other than felony convictions was admissible for impeachment. (Id. at ¶. 291-292.) Nothing in Allen suggests that the misconduct underlying juvenile adjudications is inadmissible for impeachment.

Sanchez held that a juvenile adjudication is not admissible as a felony conviction for impeachment because it is not a conviction. (Sanchez, supra, 170 Cal.App.3d at ¶. 218-219. Jackson held that Welfare and Institutions Code section 1772 prevented a juvenile adjudication from being used to impeach a minor who had been honorably discharged by the Youth Offender Control Board. (Jackson, supra, 177 Cal.App.3d at ¶. 713-714.)  Neither case considered whether evidence concerning the juvenile misconduct underlying an adjudication is admissible.[13]

Defendant claims counsel should have made hearsay objections to certain questions designed to impeach him based on information in a CYA Parole Consideration Report. Quoting the report, the prosecutor asked whether defendant had admitted during a group session that he not only possessed a gun but also intended to show a younger gang member how to kill somebody. Defendant denied saying that and claimed the report was inaccurate. Thereafter, the prosecutor noted that defendant had

---

[11]For example, defendant was asked whether he had robbed an 11-year old boy and then intimidating him by acting as if he had a gun and warning that he knew where the boy lived.

[12]The prosecutor did ask whether defendant was committed to CYA after his arrest for possessing a weapon, ammunition, a ski mask, and rubber gloves and whether he was committed to CYA for robbery. Even assuming those questions impermissibly used the fact of a juvenile adjudication for impeachment, the failure to object to those two questions was harmless because, as discussed above, the misconduct underlying the commitment was admissible for impeachment.

[13]Defendant notes that before trial, the prosecutor argued that her witnesses could not be impeached with their juvenile adjudications. Thus, defendant claims the prosecutor was guilty of misconduct by later doing to him what she had previously argued was not allowed. However, as noted, defendant forfeited any claim of prosecutorial misconduct. Moreover, in light of our discussion concerning impeachment with juvenile misconduct, there is no reasonable probability defendant would have obtained a more favorable result had defense counsel objected to the impeachment on grounds of prosecutorial misconduct. (Strickland v. Washington, supra, 466 U.S. at pp. 688, 694.)

taken a victim awareness class and asked him whether he had been found to be "self-centered and narcistic [sic ]" concerning his criminal victims. Defendant answered, "Self-centered I can agree with. Narcistic [sic ] I can't agree with because I don't know what it means."

As to the first question, defendant has not demonstrated that a hearsay objection would have been sustained. The prosecutor did not attempt to introduce the CYA report into evidence, and it was not admitted. The prosecutor's question itself was not testimony or evidence, and jurors were instructed not to treat it as such. (See CALJIC No. 1.02.) Jurors are capable of distinguishing the testimony of witnesses from the statements or questions of counsel, and therefore we presume that jurors follow such instructions. (See People v. Yeoman (2003) 31 Cal.4th 93, 139; e.g., People v. Smithey (1999) 20 Cal.4th 936, 961; People v. Boyette (2002) 29 Cal.4th 381, 436.) Moreover, insofar as defendant was asked about a statement that he had allegedly made, evidence of his statement would have been admissible over a hearsay objection as a party admission. (Evid.Code, § 1220.) However, defendant denied making the statement.

As to the second question, defendant testified on direct that he took a victim awareness class at CYA. The prosecutor's question asked about CYA's evaluation of his performance. Insofar as the conclusion that defendant was self-centered and narcissistic represented an extra-judicial statement by CYA officials offered for the truth, a hearsay objection would have prevented defendant from repeating it or agreeing that it had been said. However, the failure to object was harmless. The potential prejudice from defendant's admission that he was self-centered was inconsequential compared with the negative impression of his character from other conduct that he admitted. For example, he said he threatened to kick Lisa's "A" because she returned a vehicle he had bought without returning his money. He testified that Lisa had wanted him to stop selling crack, and when he told her he would have no place to stay if he did, she arranged for them to live with her father. However, he never stopped selling drugs. He also testified that he was furious about a rumor concerning Lisa and Jason, he asked his sister to "[s]ock that bitch in the mouth"; and he admitted that, despite Lisa's repeated protestations of love, he threatened to assault her, saying, "If I see you, I'm gonna slam my dick in your face."

Defendant complains that counsel should have made relevance objections to questions about the killing of Anton Tinsley near Broadway, which insinuated that the killing was the basis for the name Mob-i.e., murder on Broadway. However, those questions were well within the scope of cross-examination about defendant's direct testimony concerning the origins of his gang, its name, the infighting among Seaside Crip gangs, and the killing of his friend Michael Butler. Moreover, the questions were highly relevant concerning defendant's credibility on gang related subjects.

Defendant complains that counsel should have made a relevance objection when the prosecutor asked whether Latina Harris had to summon him to come downstairs when police came to her home to investigate the shooting at Boykin's car and whether she was angry that defendant had brought the police to her door. Defendant answered "no" to both questions.

Defendant testified that after the shooting, he called a friend to see if the police were in the area, and then he went to Latina's home. However, police saw him as he walked through the gate of the building. He knocked on the window, and when Harris came to the door, he asked to use the upstairs bathroom. She allowed him inside, and when he came back downstairs, she was talking to the police. Both Officers Martin and Gonzalez also testified about locating defendant at Latina Harris's home and the circumstances surrounding their conversation with both Latina and defendant.

The prosecutor's first question was relevant insofar as it related to the circumstances under which the police spoke to defendant, and it tested the implication that he voluntarily came downstairs, as if he had nothing to hide. The second question-whether Harris was angry at him-was irrelevant, and an objection would have been sustained.

Defendant claims that the question was prejudicial because it "[s]hows that his friends are angry with him." However, defendant denied that Harris was angry with him, and there was no testimony that Latina was angry at him. Moreover, the prosecutor's question itself was not evidence. Under the circumstances, therefore, jurors had no evidentiary basis to infer that Latina or any of defendant's other friends were angry. In any event, it is not so uncommon for friends to get mad at each other, and that they do does not necessarily reflect a bad character trait. Accordingly, we find no reasonable probability that defendant would have obtained a more favorable result on any count had counsel successfully objected to the question. (<u>Strickland v. Washington</u>, supra, 466 U.S. at ¶. 688, 694.)

Defendant complains that the prosecutor asked, "In the movie Rocky, I guess that's what he was doing, right? He went around to collect debts and broke people's arms or broke arms?" Defendant answered, "I don't really remember. I remember the boxing ring fights." Defendant also complains that he was asked whether Michael Fowler was an enforcer for the Mob. Defendant answered that he was "actually a drug addict."

In asking those questions, the prosecutor was focusing on the shooting at Boykin's car after Boykin was held responsible for his friend's alleged failure to pay for some drugs. She asked generally what gangs do when they get "ripped off" and whether gangs have "enforcers." Defendant said, "Some do, yes." The prosecutor then asked the "Rocky" question.

Defendant also testified that if a drug user rips off a gang dealer, the problem is usually between the two of them, and the dealer may retaliate; however, he agreed that sometimes other gang member may retaliate. The prosecutor then asked about Michael Fowler.

We agree that the "Rocky" question was irrelevant, lacked foundation, and seems argumentative. However, given defendant's admission that some gangs have enforcers and sometimes gang members retaliate, we fail to see how the "Rocky" question and defendant's answer were prejudicial. Moreover, given defendant's testimony and defendant's intimate knowledge of the Mob, we find the question about Fowler to be relevant. Indeed, defendant mentioned Fowler during his direct testimony.

In addition to the substantive objections discussed above, defendant complains that counsel should have challenged many questions because they were compound. However, even if some or all of those objections had been sustained, the prosecutor could have simply broken the questions down into their component parts and re-asked them. Moreover, the record does not reveal that defendant was confused by the questions; instead, he understood and answered them. Thus, unless the subject matter of compound questions was objectionable on some other grounds, the failure to make "compound" objections was harmless. (<u>See</u> <u>Kelley v. Bailey</u> (1961) 189 Cal.App.2d 728, 737 [error concerning compound questions harmless where witness understood and answered them]; <u>Board of Trustees of Contra Costa Junior College District v. Schuyten</u> (1958) 161 Cal.App.2d 50, 58 [same]; <u>Clay v. Lagiss</u> (1956) 143 Cal.App.2d 441, 445 [same].)

Much the same can be said about objections that certain questions were

24

argumentative.[14] We agree that many questions were objectionable as argumentative. However, our focus now is on the potential prejudice from defense counsel's failure to object. Without minimizing the impropriety of the prosecutor's argumentative questions, we observe that generally, in asking such questions, the prosecutor did not state or imply the existence of facts not otherwise before the jury; some of the questions could have been restated as proper and appropriate questions; some simply highlighted the improbability of defendant's explanation; and most, if not all, of the argument contained in the questions properly could have been, and was, made to the jury at the appropriate time. (See People v. Guerra, supra, 37 Cal.4th at p. 1127; People v.. Price (1991) 1 Cal.4th 324, 484.)

We further note that defendant's answers were not damaging. They were short, direct, and consistent with his claim of innocence. (See People v. Johnson (2003) 109 Cal.App.4th 1230, 1236.) For example, on direct, defendant testified that after his release from CYA he came to Seaside and was jailed because he likes to take pictures and stole a disposable camera from Safeway. On cross-examination, the prosecutor focused on the pictures of defendant taken with a disposable camera on the day of the shooting and asked, "Now you told us that you like to take pictures. That's why you stole some cameras from Safeway in 2001, because you like to take pictures so much. [Are there] [a]ny pictures-no pictures on this roll of anyone but you on 11/11/02; is that right?" Defendant agreed that he was the only one pictured. To the extent the question was argumentative, it and defendant's answer were harmless because the fact is, neither Lisa nor defendant had taken pictures of anyone else that day despite the fact that they were allegedly having an impromptu baby shower with other guests.

Finally, insofar as the prosecutor may have implied the existence of certain facts that were not yet, or ever, before the jury, defendant suffered no appreciable harm because, as noted, the court instructed jurors to not infer the existence of any facts from counsels' questions.

Our analysis concerning compound and argumentative questions also applies to the questions that defendant claims called for speculation. Defendant answered each of them with a general or noncommittal answer or simply said he did not know; and, again jurors were instructed not to infer anything from questions themselves.

Defendant specifically complains about questions that asked whether certain witnesses had lied.

In People v. Chatman, supra, 38 Cal.4th 344, the Supreme Court explained that were-they-lying type questions are improper when they are argumentative, call for speculation, or are designed to elicit irrelevant testimony. However, such questions are proper and permissible when the defendant is a percipient witness to the events at issue or is well acquainted with the witness and thus has personal knowledge that can assist the trier of fact in determining whether particular witnesses, whose testimony differs from the defendant's, are intentionally lying or are merely mistaken. (Id. at p. 383-384.)

Here, the questions defendant cites did not impermissibly call for irrelevant

---

[14] "An argumentative question is a speech to the jury masquerading as a question" and is improper because "it does not seek to elicit relevant, competent testimony, or often any testimony at all." (People v. Chatman (2006) 38 Cal.4th 344, 384.) Instead, it is designed to either engage the witness in argument or argue directly to the jury. (Ibid.; People v. Guerra (2006) 37 Cal.4th 1067, 1125.)

1

speculation. They involved testimony and police reports concerning events to which
2 defendant was a percipient witness: the sale of drugs to Jones and defendant's flight
from police on November 14, 2002. They also concerned Lisa's testimony about his
3 handwriting on a jailhouse note. Given his personal knowledge concerning all of
these matters, defendant could have assisted the jury in determining why the
4 testimony of those witnesses differed from his own and whether the witnesses were
lying.
5

In light of our whole discussion, we conclude that defendant has failed to demonstrate
6 a reasonable probability that the jury would have returned a more favorable verdict
on any charge or allegation had defense counsel objected to the prosecutor's questions
7 whenever it was theoretically possible to do so, or had counsel raised a more general
claim of prosecutorial misconduct. Simply put, as to those objections, both
8 individually and collectively, counsel's omissions do not undermine our confidence in
the jury's verdict. (<u>Strickland v. Washington</u>, supra, 466 U.S. at ¶. 688, 694.)

9 <u>Horne</u>, 1007 WL 1098648 at *19-25 (footnotes in original).)

10        The California Court of Appeal's prejudice analysis was not only detailed and exhaustive,

11 but it persuasively explained why each of the objections that Petitioner contends counsel should

12 have made were unlikely to make a difference in the outcome of the case.  As the Court of Appeal

13 explained, most of the objections would have been overruled or the prosecutor's questions would

14 have easily been rephrased in a permissible form.  Those questions that could have been prevented

15 by objection, moreover, elicited little if any useful response from Petitioner, and certainly did not

16 produce sufficient damaging testimony to make a difference in the case in light of the strength of the

17 evidence against Petitioner.  Consequently, the Court of Appeal not only applied the correct

18 prejudice standard from <u>Strickland</u>, but reasonably applied that standard in concluding that

19 Petitioner was not prejudiced by counsel's performance during Petitioner's cross-examination.

20        Petitioner contends that the standard in <u>United States v. Cronic</u>, 466 U.S. 648, 658-62 (1984),

21 applies here.  The <u>Cronic</u> standard, in which a defendant is not required to show prejudice, applies

22 only to those rare cases where counsel "entirely fail[ed] to subject the prosecution's case to

23 meaningful adversarial testing."  <u>Id.</u> at 659. The record demonstrates that that plainly did not occur.

24 Counsel made an opening statement and closing argument, made numerous motions and objections,

25 cross-examined all of the many prosecution witnesses, hired an investigator, called a number of his

26 own witnesses, and advised Petitioner not to testify.  Counsel certainly subjected the prosecution's

27 case to "meaningful adversarial testing," and <u>Cronic</u> does not apply.

28        The state court's denial of this claim was neither contrary to nor an unreasonable application

26

of federal law.  Petitioner is not entitled to habeas relief on this claim.

### C.      Narrative Testimony

Petitioner claims that trial counsel was ineffective in refusing to present Petitioner's testimony by direct examination, leaving Petitioner to give his testimony in narrative form.  As described above, counsel did not believe that Petitioner's testimony would be truthful and consequently advised him not to testify.  When Petitioner rejected this advice, counsel informed the trial court that he would not participate in presenting Petitioner's testimony.  The United States Supreme Court has held that counsel's refusal to present a defendant's false testimony does not deprive the defendant of his right to effective assistance of counsel.  Nix v. Whiteside, 475 U.S. 157, 173-74 (1986).  Moreover, when confronted with a defendant who insists on providing testimony that defense counsel deems untruthful, the defendant may be required to testify in narrative form. See United States v. Omene, 143 F.3d 1167, 1170-72 (9th Cir.1998) (trial court does not violate defendant's right to counsel by requiring defendant to testify in narrative form regarding matters defense counsel deems perjurious).  Under this authority, counsel did not perform deficiently in refusing to participate in the presentation of testimony from Petitioner that counsel believed would be perjurious.

Petitioner also has not shown that he was prejudiced by his having to testify in narrative form.  Petitioner identifies no testimony that he would have given in a question and answer format that he did not give in his narrative testimony.  Consequently, there is no reasonable likelihood that the outcome of the proceedings would have been different if Petitioner had not provided narrative testimony at trial.

The state court's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of federal law.[15]  Petitioner is not entitled to habeas relief on this claim.

### D.      Notice of Sentencing Factor in Attempted Murder Charge

Petitioner claims that counsel was ineffective in failing to object to the lack of notice that the prosecution would seek an enhanced sentence of life in prison on the attempted murder charge based

---

[15]Although this claim was raised in Petitioner's habeas petition to the California Supreme Court, which was summarily rejected, the California Court of Appeal also addressed the issue in its opinion on direct appeal.  See Horne, 2007 WL 1098684 at *16-18.

1  on a finding, under California Penal Code § 664, that the attempted murder was "willful, deliberate

2  and premeditated."  Section 664 provides, in pertinent part:

3     Every person who attempts to commit any crime, but fails, or is prevented or
       intercepted in its perpetration, shall be punished where no provision is made by law
4      for the punishment of those attempts, as follows: [¶] (a) ... [I]f the crime attempted is
       willful, deliberate, and premeditated murder, as defined in Section 189, the person
5      guilty of that attempt shall be punished by imprisonment in the state prison for life
       with the possibility of parole. If the crime attempted is any other one in which the
6      maximum sentence is life imprisonment or death [i.e., murder], the person guilty of
       the attempt shall be punished by imprisonment in the state prison for five, seven, or
7      nine years. *The additional term provided in this section for attempted willful,
       deliberate, and premeditated murder shall not be imposed unless the fact that the*
8      *attempted murder was willful, deliberate, and premeditated is charged in the*
       *accusatory pleading and admitted or found to be true by the trier of fact.*"
9

10 Cal. Pen. Code § 664 (Emphasis added).  The amended indictment/information cited California

11 Penal Code § 664 in the attempted murder charge, but it did not explicitly allege that the attempted

12 murder was premeditated, willful and deliberate.  (Resp't. Ex. 1 at 827-88; 966.)

13     In addition to California's statutory pleading requirement, set forth in California Penal Code

14 § 664, it is clearly established federal law that a criminal defendant has a Sixth Amendment right to

15 be informed of any charges against him, and that a charging document, such as an information, is the

16 means by which such notice is provided.  Gautt v. Lewis, 489 F.3d 993, 1004 (9th Cir. 2007) (citing

17 Cole v. Arksanas, 333 U.S. 196, 201 (1948).  This requirement includes factors that enhance a

18 sentence beyond the "statutory maximum."  See Apprendi v. New Jersey, 530 U.S. 466, 488-90

19 (2000).

20     The California Court of Appeal found that counsel had a reasonable tactical basis for failing to

21 object to the omission of the premeditation enhancement in the charging documents.  Horne, 2007

22 WL 1098684 at *35.  Regardless of whether the failure to object was reasonable, it was certainly not

23 prejudicial under Strickland.  See Strickland, 466 U.S. at 697 (court need not evaluate whether

24 performance deficient where prejudice lacking).  Petitioner knew that the evidence of attempted

25 murder was that Petitioner chased Ewing's fleeing companion, Jaymes Lambert, and shot at him

26 repeatedly immediately after walking up to Ewing and shooting him at close range.  It is clear from

27 this evidence,  from the prosecutor's arguments during trial, from his examination of witnesses, and

28 from the discussions with the trial court and defense counsel about jury instructions, that the

prosecutor intended to try to prove that the attempted murder was willful, deliberate and

premeditated.  Had defense counsel objected to the omission of the premeditated enhancement in the attempted murder charge, it is extremely likely that the prosecutor would have amended the information to allege the enhancement.

In addition, had the information been so amended, the record demonstrates that the outcome of the case would not have been different.  The jury instructions, which counsel had discussed with the prosecutor and the court, both defined the terms premeditated, deliberate and willful, and stated that "It is also alleged in Count 2 that the crime attempted was willful, deliberate and premeditated murder. If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not."  Horne, 2007 WL 1098684 at *35.  In addition, the verdict form for attempted murder required the jury to find the allegation of willful, deliberate and premeditated to be true, which the jury did.  Id.  Under these circumstances, any objection by counsel to the information and indictment would have very likely resulted in an amended information that set forth the element of "willful, deliberate and premeditated" attempted murder, and the verdict and sentence would have very likely been the same.  See Jones v. Smith, 231 F.3d 1227, 1239 (9th Cir. 2001) (finding informations's failure to specifically charge premeditation in attempted murder charge under California Penal Code § 664 was harmless because jury instructions set forth premeditation requirement and trial proceeded as though it had been charged).  Here, as in Jones, the "trial that transpired was no different from that which would have transpired had the information set out premeditation and deliberation."  Id.

As there is no reasonable likelihood that the outcome of the trial would have been different had counsel objected to the attempted murder charge, Petitioner has not suffered prejudice under Strickland from counsel's performance.

Petitioner does not claim in his amended petition that the omission of the premeditation enhancement in the attempted murder charge violated his Sixth Amendment rights, only that counsel was ineffective in failing to object to object to that omission.  (Amend. Pet. at 16-17.)  The traverse, however, does claim the underlying Sixth Amendment violation.  (Traverse at 14-15.)  This claim fails for three reasons.  First, a claim may not be raised for the first time in a traverse.  Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).  Second, the claim is procedurally defaulted from

federal habeas review because the California Court of Appeal denied the claim on the grounds that Petitioner had not raised it an objection at trial.  Horne, 2007 WL 1098684 at *35 (as Petitioner did not object at trial to the omission of the premeditation enhancement from the charging documents, he "may not now complain of a violation of the statutory pleading requirement or his constitutional right to notice"); see Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005) (California's contemporaneous objection rule is grounds for federal procedural default).  Third, the omission of the sentence enhancement factor for premeditation was harmless for the same reasons that the omission was not prejudicial under Strickland, discussed above.  See Jones, 231 F.3d at 1239 (failure to charge premeditation enhancement sentence enhancement factor premeditation in attempted murder under § 664 is subject to harmless error analysis).

The state court's denial of Petitioner's claim was neither contrary to nor an unreasonable application of federal law.  Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: 3/8/10

SAUNDRA BROWN ARMSTRONG
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE

1    NORTHERN DISTRICT OF CALIFORNIA

2

3    JOSEPH D. HORNE,                                    Case Number: CV07-04592 SBA

4              Plaintiff,                                **CERTIFICATE OF SERVICE**

5        v.

6    ROBERT HOREL et al,

7              Defendant.
     _____/

8

9    I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
     Court, Northern District of California.

10
     That on March 15, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said
11   copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
     envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
12   located in the Clerk's office.

13

14   Joseph Deonn Horne V-84328
15   Kern Valley State Prison
     P.O. Box 5102
16   Delano, CA 93216

17

18   Dated: March 15, 2010

19                                           Richard W. Wieking, Clerk
                                             By: LISA R CLARK, Deputy Clerk
20

21

22

23

24

25

26

27

28